The STATE of Ohio, Appellee,

v.

PETITJEAN, Appellant.

[Cite as *State v. Petitjean* (2000), 140 Ohio App.3d 517.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 99CA31.

Decided Nov. 17, 2000.

518

*Gary A. Nasal,* Miami County Prosecuting Attorney, for appellee.

*James T. Ambrose* and *Daniel L: O'Brien,* for appellant.

GRADY, Presiding Judge.

Shawn H. Petitjean appeals from his conviction for aggravated murder, which was entered on his plea of no contest after the trial court overruled Petitjean's motion to suppress evidence. Petitjean was sentenced to life imprisonment with the eligibility for parole after having served twenty years.

Tara Latimer was stabbed to death in her apartment on December 17, 1998. She suffered eight stab wounds, which were inflicted with a knife. She was also beaten about the head and face. Her two young children were in the apartment but were not harmed. Petitjean was one of five or six people whom detectives suspected of Latimer's murder.

On December 22, 1998, Petitjean came to the Troy Police Department at the request of Troy Police Detectives Steve Cruea and Joe Stutz. Detective Stutz escorted Petitjean to an interview room on the second floor of the police department. The detectives gave Petitjean a "Non–Custodial Interview Form," which stated that Petitjean was not under arrest, that he did not have to speak with the detectives, and that he was free to leave. Petitjean signed and dated the form, acknowledging that he understood its terms.

The two detectives questioned Petitjean about Latimer's murder. Their conversation was both tape-recorded and videotaped. Detective Cruea had asked Petitjean to submit to a computer voice stress analyzer ("CVSA") examination. Petitjean declined the request. Nevertheless, Detective Cruea proceeded to conduct the CVSA without Petitjean's knowledge. The results of the CVSA examination were inconclusive, and the detectives were unable to eliminate Petitjean as a suspect as a result of the interview.

On February 4, 1999, the detectives came to Petitjean's apartment and asked to speak with him again at the police department. On February 8, Petitjean went to police headquarters. The detectives again gave him a Non–Custodial Interview Form and Petitjean again signed and dated the form. During the subsequent interview, Petitjean admitted to killing Latimer when he went to her apartment to complain about Latimer's interference in Petitjean's relationship with another woman. The detectives then read Petitjean the warnings required by *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and Petitjean again admitted to killing Latimer. After a break, during which Petitjean was fingerprinted, photographed, and provided refreshments, Petitjean was *Mirandized* a second time. Petitjean proceeded to answer more questions regarding Latimer's murder during a further, second interview.

Petitjean was indicted for aggravated murder. He filed a motion to suppress his statements to the detectives, arguing that his waiver of his Fifth Amendment right against self-incrimination was not voluntary. The trial court held a hearing on the motion on the 13th and 15th of April, 1999. The trial court denied the motion, concluding that Petitjean "did not appear to be overcome with fear during the process of the interview to such a degree that his will was overcome at any time." The court also found that Petitjean was not in custody and therefore *Miranda* warnings were not required until he was handcuffed at the end of the second interview on February 8. The court also found that Petitjean had not requested counsel and concluded that his constitutional right to counsel was not violated.

On July 12, Petitjean entered a plea of no contest to a charge of aggravated murder in violation of R.C. 2903.01(A). He was sentenced to life imprisonment with the possibility of parole after serving twenty years.

Petitjean timely appealed. He presents three assignments of error for our review. They will be considered in the order that facilitates our discussion of them.

## FIRST ASSIGNMENT OF ERROR

"The trial court committed prejudicial error when it ruled that the defendant was not in custody at the time of his interrogation."

Petitjean argues that police were required to give the warnings prescribed by *Miranda v. Arizona, supra,* earlier than they did, which was after he had confessed to killing Tara Latimer during the February 8, 1999 interrogation at police headquarters. His complaint in that regard necessarily pertains to the prior portions of that interview, as well as to the interview on December 22, 1998.

*Miranda* requires police to give a suspect certain prescribed warnings before custodial interrogation commences and provides that if the warnings are not given, any statements elicited from the suspect through police interrogation in that circumstance must be suppressed. The critical issue in most instances is whether the suspect was in *custody* when the interrogation took place. That is the issue here.

The *Miranda* court stated: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.,* 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. In subsequent cases, the court held that custody requires an arrest or its functional equivalent and that this determination must be based on objective criteria, not the subjective view of either the police officer or the suspect.

■ *Miranda* was concerned with the inherent coercion of station-house interrogation. However, not all station-house interrogation triggers the *Miranda* warning requirement. It is the fact of custody, not its purpose, that is determinative.

In *Oregon v. Mathiason* (1977), 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714, a police officer asked the defendant to come to the police station, and after he arrived the officer told the defendant that he was not under arrest. The defendant confessed during the interview. The Supreme Court held that warnings were not required, stating:

"In the present case * * * there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'" *Id.,* 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719.

■■ Whether a station-house interrogation is custodial depends on whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279. The issue is determined by an objective test: whether a reasonable person would believe, based on all of the circumstances, that he or she was under arrest or its functional equivalent. *Stansbury v. California* (1994), 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293.

Here, Petitjean voluntarily came to police headquarters on both December 22, 1998 and February 8, 1999. So did the defendants in *Mathiason, Beheler,* and

*Stansbury,* and in each of these cases that fact was significant to the finding that they were not in custody. As in *Mathiason,* Petitjean was informed that he was not under arrest. The form that Petitjean signed on each occasion also advised him that he was free to leave at any time. He was not searched or handcuffed and was not put into a jail uniform. The interrogations were conducted in a room where the door was closed but unlocked.

We conclude, as did the trial court, that a reasonable person in Petitjean's situation would not believe that he was under arrest or its functional equivalent until the time when *Miranda* warnings were in fact given, after he had confessed to killing Tara Latimer. The first assignment of error is overruled.

## THIRD ASSIGNMENT OF ERROR

"The trial court committed prejudicial error when it ruled that the defendant's constitutional rights to counsel was not violated."

When Petitjean arrived at police headquarters on December 22, 1998, Detective Cruea asked him to submit to a "covert voice stress analysis," or CVSA test. Petitjean testified at the suppression hearing that he told Detective Cruea that he would want to speak with a lawyer or his mother before he could agree. Det. Cruea testified that he could recall no such request, and had one been made he would remember it. The trial court found, as a matter of fact, that Petitjean made no such request when he was asked to submit to the CVSA.

The Sixth Amendment right to counsel pertains to judicial proceedings. The right attaches in felony cases after the defendant's initial appearance in court on the charge. *United States v. Dohm* (C.A.5, 1980), 618 F.2d 1169. The right does not pertain to police interrogation, except when an accused who is in custody invokes his *Miranda* right to speak with an attorney. Then, interrogation must cease until the accused consults with an attorney. *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378.

Petitjean was not in custody when he made the alleged request. However, and more fundamental to the issue presented, the trial court found that he made no such request. We are required to give great deference to that decision. *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640. Evaluations of the evidence and of the credibility of the witnesses are issues for the trier of fact. *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972.

Essentially, the trial court found that Petitjean was not credible, and elected to instead believe Det. Cruea. Issues of credibility are primarily for the trial court to determine. Absent any other evidence to the contrary, we are not disposed to disturb that finding. Therefore, we see no basis to find that the detectives

violated any right to counsel that Petitjean had invoked when they questioned him and conducted the CVSA without his knowledge or agreement. The third assignment of error is overruled.

## SECOND ASSIGNMENT OF ERROR

"The trial court committed prejudicial error when it ruled that the defendant's statements were voluntary."

This assignment of error presents one of the most difficult questions to confront the courts, a question that also engages and agitates the popular imagination: whether a defendant who has confessed that he committed a crime may nevertheless have his confession excluded from use in his subsequent prosecution because the confession was involuntary.

The Fifth Amendment to the Constitution of the United States and Section 10, Article I of the Ohio Constitution each provide that no person in any criminal case shall be compelled to be a witness against himself. The Ohio provisions are identical to the federal provisions, which are themselves applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Brown v. Mississippi* (1936), 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682.

The concern that animated the framers to adopt the Fifth Amendment was not a desire to favor criminals or a belief that the power of the state is oppressive and therefore requires constraint. Rather, it was that coerced confessions are inherently untrustworthy. *Dickerson v. United States* (2000), 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405. " 'A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt * * * but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape * * * that no credit ought to be given to it; and therefore it is rejected.' " *Id.* at 433, 120 S.Ct. at 2330, 147 L.Ed.2d at 412, quoting *King v. Parratt* (N.P. 1831), 4 Car & P. 570, 12 Eng. Rep. 829.

As with the other affirmative protections that the Bill of Rights confers, the Fifth Amendment right against self-incrimination may be waived. However, the waiver must be voluntary. "A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Otte* (1996), 74 Ohio St.3d 555, 562, 660 N.E.2d 711, 719, citing *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473; *State v. Dailey* (1990), 53 Ohio St.3d 88, 559 N.E.2d 459, paragraph two of the syllabus.

■ In recent years, since the 1966 *Miranda* decision, most Fifth Amendment voluntariness inquiries have focused on whether a suspect was "in custody," so as to require the prescribed warnings before interrogation could commence. The question does not encompass the entire concern of the Fifth Amendment, however. As the Supreme Court very recently pointed out in *Dickerson,* the Due Process Clause continues to require an inquiry, separate from the custody considerations, " 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson,* 530 U.S. at 434, 120 S.Ct. at 2331, 147 L.Ed.2d at 413, quoting *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854, 862. That is so because "[t]he due process test takes into consideration 'the totality of all of the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " *Id.*

■ " 'If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant'). The determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.' *Stein v. New York,* 346 U.S. 156, 185, 73 S.Ct. 1077 [1093], 97 L.Ed..1522 [1542] (1953)." *Dickerson, supra,* 530 U.S. at 434, 120 S.Ct. at 2331, 147 L.Ed.2d at 413.

■ *Dickerson* confirms what Ohio has recognized, that the two issues of voluntariness of a confession and compliance with *Miranda* are analytically separate inquiries. *State v. Chase* (1978), 55 Ohio St.2d 237, 9 O.O.3d 180, 378 N.E.2d 1064; *State v. Kassow* (1971), 28 Ohio St.2d 141, 57 O.O.2d 390, 277 N.E.2d 435. The United States Supreme Court has continued to measure confessions against the requirements of due process. *Miller v. Fenton* (1985), 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405. In *Dickerson,* the court stated: "We have never abandoned the due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily." *Id.* at 434, 120 S.Ct. at 2331, 147 L.Ed.2d at 413, citing *Malloy v. Hogan* (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653. Thus, a confession may be involuntary even where *Miranda* warnings are given. Further, even when *Miranda* warnings are not required, a confession may be involuntary if on the totality of the circumstances the " 'defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson, supra,* 530 U.S. at 434, 120 S.Ct. at 2331, 147 L.Ed.2d at 413.

Petitjean argues that the confession he gave to police that he killed Tara Latimer was involuntary and should be suppressed even if the interrogation that produced it did not require *Miranda* warnings, as we have found. Petitjean argues that his power of resistance was overcome and his confession was rendered involuntary by false promises of leniency made by police that induced

him to confess. He relies on *State v. Arrington* (1984), 14 Ohio App.3d 111, 14 OBR 125, 470 N.E.2d 211.

In *Arrington*, officers told an accused who was one of two co-defendants indicted for aggravated murder that "if you weren't the one who pulled the trigger * * * it can be probational." Concerning the possibility of additional charges, they told him: "You can talk to us * * * you don't have to worry about no additional charges." The trial court suppressed the statements as involuntary. The court of appeals agreed, holding:

"Where an accused's decision to speak was motivated by police officers' statements constituting 'direct or indirect promises' of leniency or benefit and other representations regarding the possibility of probation which were misstatements of the law, his incriminating statements, not being freely self-determined, were improperly induced, involuntary and inadmissible as a matter of law." *Id.* at syllabus.

This court was confronted with the same issue in *State v. Hopfer* (1996), 112 Ohio App.3d 521, 679 N.E.2d 321, which involved the prosecution of a juvenile for murdering her newborn baby. She claimed that an officer who questioned her had said that she would get probation if she made a statement but would get "no mercy" unless she added incriminating language. The trial court did not believe Hopfer, and we deferred to its finding of fact. In discussing the legal issue, however, we cited *Arrington* and stated: "Promises of leniency by the police, such as probation upon conviction, are improper and render an ensuing confession involuntary. * * * However, 'admonitions to tell the truth directed at a suspect by police officers are not coercive in nature.'" *Id.* at 547–548, 679 N.E.2d at 338, citing *State v. Wiles* (1991), 59 Ohio St.3d 71, 571 N.E.2d 97, and *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895.

*Arrington* relied on a California case, *People v. Flores* (1983), 144 Cal.App.3d 459, 192 Cal.Rptr. 772, which makes an important distinction concerning promises made by police that induce a suspect's incriminating statement. The *Flores* court stated:

" 'The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. * * *

" 'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand

that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear.' (Emphasis added.)" (Quoting *People v. Hill* [1967], 66 Cal.2d 536, 549, 58 Cal.Rptr. 340 [348], 426 P.2d 908 [916].) *Arrington, supra,* at 115, 470 N.E.2d at 216.

The *Flores* distinction corresponds to the policy underlying the Fifth Amendment prohibition against the use of coerced confessions that the United States Supreme Court reiterated earlier this year in *Dickerson, supra*. When a confession is forced from the mind by the flattery of hope or by the torture of fear, it is unreliable and no credit ought to be given to it. Promises or suggestions of leniency in exchange for waiving the Fifth Amendment privilege create a *flattery of hope*, which is made even more powerful by the *torture of fear* that accompanying threats of punishment induce in the mind of the accused.

Petitjean's interrogation on February 8, 1999, wherein he confessed to killing Tara Latimer, was videotaped. Transcriptions were introduced in the hearing on the motion to suppress. The following is from Exhibit 5, at pp. 28–31:

"Cruea   And the whole truth of the matter is, Tara interfered with your relationship.

"Shawn   Uhmm . . .

"Cruea   That's what it comes down to, okay. It's that or possible one other thing, and only one other thing, cause we know that she wasn't a god damn angel either okay. Maybe you went to her house to talk to her about the problem. Tara's.

"Shawn   Mmhmm.

"Cruea   And maybe she attacked you. The problem is Shawn, you're not telling us what the fuck happened. Without your help, you're going to be looking at a murder charge. If she attacked you and you had to defend yourself, let me know it. We're tired of fucking around with you on this. It ain't fun and games no more. Take the smile off your fucking face.

"Shawn   It's not a game to me.

"Cruea   Yeah, it is a game to you. And I'll tell you what's gonna happen, your game is gonna get you up for murder. When you possibly could have fucking self-defense. It's gonna get you murder. It's gonna get you the fucking chair. Do you understand what that means?

"Shawn   I understand what you are saying.

"Cruea   Do you care what that means?   You have done nothing but fucking escalate.   You started showing a pattern of behavior in Greenville.   From there you came to here.

"Shawn   Mmhmm.

"Cruea   You got a serious god damn problem.   And you can't understand that.

"Shawn   I understand that.

"Cruea   Do you think you can walk into an apartment and not leave evidence that you were there?   Do you think that we can't pick up your _____? We can't pick up hair?   Do you think that blood can't be tested.   Do you think because you have gloves on, your fingerprints can't be picked up?

"Shawn   I know it.

"Cruea   Do you think you had that?   Do you think any of that?

"Shawn   I think—think—you know . . .

"Cruea   I'm gonna guaran-goddamn-tee it will, okay.   Now let us know what the hell happened in there.   If you had to defend yourself, you had to defend yourself.   Cause I'm gonna tell you right, now.   I don't think you're a god damn cold blooded killer because those two kids were kept safe, okay.

"Shawn   I know.

"Cruea   If you were a cold blooded killer, those kids would have been killed. They sure as hell wouldn't have been kept out of that mess.   Shawn, you are involved in this and you know god damn good and well you are.   Now you need to clear it up.   You are the one that needs to clear it up.   If we have to clear it up through evidence, you go bye-bye for a big long god damn time—for life or you lose your life.

"Stutz   No choice.

"Cruea   There is no choices.   No jokes about it.   There'll be no fucking deals. Now, the prosecutor has already promised us that.   He has guaranteed it.   Now if you had to defend yourself, get it out.   Let us know it.   We can work with that. We know she would attack you.   We're not stupid.   We know she's not a perfect little angel.   In fact, she could be a downright nasty bitch.   But if you're gonna let . . .

"Shawn   What am I—what am I looking at if I do?   Either way, I'm screwed.

"Cruea   No, you're not.   No, you're not if you had to defend yourself, Shawn, if you had to defend yourself and she happened to die out of it and you had to make it look like something else because you wanted to get the hell out of there, we can work with that.   The prosecutor will be glad to work that.

"Shawn    Yeah, but still what am I looking at?

"Cruea    What do you mean, what are looking at?   Charge wise?

"Shawn    Yes.

"Cruea    If you got self-defense, you're not looking at much of anything.   At the most, okay, at the most, an involuntary manslaughter.   Jesus Criminy, you're lucky if you get 6 months out of something like that.   If you're a good boy, which you obviously ain't been a major problem in the past . . .

"Shawn    Right.

"Cruea    . . . if you want to work with us and work with yourself, god damn you'd probably get two years of probation.

"Shawn    _____ I'll work with you guys.

"Cruea    Okay, you know, Jesus Criminy, Shawn, you're making this tough. We want to help you.

"Shawn    Christ, I was scared as fucking hell.

"Cruea    Okay. I can understand that.

"Shawn    I mean, I am as scared as hell.

"Cruea    Okay.   How the hell did this happen?"

Petitjean told the officers that Latimer had attacked him with a knife and that in the ensuing struggle she was stabbed once in the stomach.   He later added that he stabbed her three times in the chest.   He also stated that he "punched" her in the head "a couple of times."   According to the prosecutor's statement to the court when Petitjean entered his guilty plea, Latimer was stabbed eight times and beaten about the head and face with a blunt instrument.

The trial court found that Petitjean "was influenced to some degree to make his (confession) on February 8 by Detective Cruea's statements, but not to a level that would automatically invalidate the Defendant's statements without further examination and evaluation of the evidence power of the representations as compared to the weight of other factors included under the totality of the circumstances test."   Decision at 31.   These other factors included the fact that Petitjean was not in custody, the fact that no express promises were made, and the fact that the officers did not know what Petitjean's degree of involvement was when they made their representations.   The trial court concluded its analysis, stating:

"The Court recognizes that the possibilities presented to the Defendant by Cruea were very optimistic, and bordered on overreaching.   However, the representations were not necessarily false considering what the officers knew at the time even though Cruea did not believe that the victim was killed in self-

defense. As far as Cruea knew at the time, the charge could have potentially included a death penalty specification or life in prison on one hand versus possible manslaughter charges, a sentence of six months (on community control), probation, or a full exoneration from bona fide self-defense. It was implicit in Cruea's statements that these possible results depended on what the statement included and how it was perceived by the other authorities such as a prosecutor or a sentencing judge.

"Everything the detectives told the Defendant here in the way of inducement was conditional and tentative and presented in the form of possibilities or probabilities. Even the most definite of the Cruea's representations, that the Defendant 'would probably get probation' if he had a good self-defense or justification, was not definite enough to constitute a misstatement of the law. For example, in *Minner v. State* (1994), 887 S.W.2d 758, the Defendant sought to vacate his guilty plea on the basis that he was told that he would 'probably' get probation. At page 760–761 the court stated, 'Movant stated to the court that he would "probably" get probation. The probability of a lenient sentence does not indicate that it will necessarily be received and is not sufficient to render a plea involuntary.' The court found that the defendant's belief that he would probably be sentenced to probation did not render the guilty plea involuntary." Decision at 32.

The trial court analyzed the question under the rule of *United States v. Melnikas* (S.D. Ohio 1969), 929 F.Supp. 276. That rule imposes a two-prong test. First, was the police conduct objectively coercive? Second, if it was, was it sufficient to overbear the will of the accused? The second issue is to be decided according to the accused's subjective state of mind.

In *Melnikas*, customs agents who were questioning a suspect concerning a missing rare manuscript told him that they would not place him under arrest if he turned it over. However, no representations of any kind were made concerning possible criminal charges, and Melnikas was specifically told that no decision had yet been made concerning how to proceed in his case. Obviously, neither the issue of his possible criminal liability nor the severity of punishment that could result had the capacity to affect the suspect's calculus to hand over the manuscript, which he did. More pertinent to that inquiry is the opinion of the Sixth Circuit in *United States v. Parker* (1993), 997 F.2d 219. There, though it was unclear as yet whether inducements were offered, the court held that the defendant's admissions should be suppressed if he was induced to cooperate by promises made by agents to "explain to the U.S. Attorney to help him on his case" when the leniency suggested was not legally possible.

Here, officers questioning Petitjean about Tara Latimer's murder told him that he was facing a murder charge and that if they had to gather evidence

through investigation to use against him "you go bye bye for life, or lose your life." Alternatively, they told him, "if you want to work with us and work with yourself, god damn you'd probably get two years of probation." Those statements followed the officers' strong encouragements to "get it out" if he had to defend himself against an attack by Latimer.

Testifying at the hearing on Petitjean's motion to suppress, officers admitted that they never believed that self-defense was a possibility, and said so only to induce Petitjean to confess. Such trickery is not prohibited, however. Further, Petitjean was aware of what, if anything, had transpired between him and Latimer and knew whether he had acted in self-defense, independent of any representations the officers made. Therefore, the officers' inducement lacked the capacity to impair Petitjean's own calculus to waive his Fifth Amendment right.

■■ Changing their focus from past events to the choice now facing him, the officers told Petitjean that "you'd probably get two years of probation" if "you want to work with us." This specifically conditioned the availability of probation on Petitjean's waiver of his Fifth Amendment privilege. That assurance of leniency was a misstatement of the law that so undermined Petitjean's calculus that it critically affected his capacity for self-determination. *State v. Otte, supra.*

In reaching a contrary conclusion, the trial court reasoned that the probation alternative was possible in the event that Petitjean was charged with a manslaughter offense. That view assumes that Petitjean would be charged with involuntary manslaughter, R.C. 2903.04, as the officers had suggested. Where, as here, the likely underlying offense, felonious assault, is a felony, involuntary manslaughter is a felony of the first degree, for which definite terms of imprisonment from three to ten years, not six months, must be imposed. R.C. 2903.04; R.C. 2929.14(A)(1). Community control sanctions for involuntary manslaughter may *technically* be possible. See R.C. 2903.04(D); R.C. 2929.13(D); R.C. 2929.15(A)(1); *State v. Weitbrecht* (1999), 86 Ohio St.3d 368, 715 N.E.2d 167. However, given the violent nature of this homicide and the number and nature of the wounds inflicted upon the victim, that form of release was not a realistic possibility.

It was almost inevitable that should he confess to killing Latimer, Petitjean would be charged with voluntary manslaughter, R.C. 2903.03, if not murder, R.C. 2903.02. Voluntary manslaughter is a first degree felony that carries a presumption that a term of imprisonment is necessary. R.C. 2929.13(D). The penalty for murder is an indefinite term of fifteen years to life. R.C. 2929.02(B). In the event, and upon his confession, Petitjean was charged with aggravated murder, R.C. 2903.01, the penalty is death or imprisonment for life. R.C. 2929.02(A).

The probation alternative that the officers presented Petitjean was so remote from reality as to be illusory. Pitted against the alternative they gave him, which confronted him with the prospect of the death penalty should he remain silent, that false hope critically affected Petitjean's capacity for self-determination, per *Otte,* because it fatally undermined his capacity for rational calculation. Because of that, his will was overborne and his resulting decision to waive his Fifth Amendment rights to obtain the benefit to be derived from a waiver was involuntary.

Applying the totality-of-the-circumstances standard, per *Dickerson,* the trial court nevertheless found that Petitjean's decision to waive his rights was not impaired by the officers' statements. The court based its finding on two factors, per *United States v. Melnikas, supra.*

First, the court found that the interrogation was not coercive because promises of leniency that the officers made were *conditional* and *tentative,* presented in the form of *possibilities or probabilities.* Read carefully, they may be. However, the suspect's capacity to understand those matters is affected by his prior experience, by the duration and tone of the interrogation, by the threats of punishment should he not accede, and by the source of the promises. Equivocal language alone is, therefore, insufficient to save police misrepresentations of leniency when those other factors weigh heavily in favor of a finding of involuntariness, as they do here.

Second, based on the record of his interrogation and his testimony at the suppression hearing, the trial court found as a matter of fact that Petitjean's will was not overborne. When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972. A reviewing court will not disturb the trial court's findings of fact where there is sufficient evidence to support them. *State ex rel. GF Business Equip., Inc. v. Indus. Comm.* (1982), 2 Ohio St.3d 86, 2 OBR 639, 443 N.E.2d 147. The corollary, of course, is that an appellate court must review the record to determine if there was sufficient evidence to support the trial court's findings. This is not a factual determination, however, but a question of law under R.C. 2505.01, which provides that questions of weight and sufficiency of the evidence are questions of law. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935. That requires an independent review, without deference to the trial court's conclusions. *State v. Satterwhite* (1997), 123 Ohio App.3d 322, 704 N.E.2d 259; *State v. Medcalf* (1996), 111 Ohio App.3d 142, 675 N.E.2d 1268; *State v. Klein* (1991), 73 Ohio App.3d 486, 597 N.E.2d 1141.

We have very carefully reviewed the videotaped interrogation as well as the transcript of the suppression hearing. We can find from those sources no credible evidence to support the trial court's finding that Petitjean's will was not overborne by the interrogation that caused him to waive his Fifth Amendment privilege. That record demonstrates, unequivocally, that Petitjean was "scared as hell," as he put it, by the officers' threats, and that he waived his privilege only after and because of their assurances. Indeed, nothing occurred at the suppression hearing to support a contrary finding. Petitjean's testimony that he believed that the officers had an electric chair in the basement they intended to put him in is no more than an attempt to portray his state of fear through hyperbole.

The rationale of *Arrington,* which this court expressly adopted in *Hopfer,* is that false promises made by police to a criminal suspect that he can obtain lenient treatment in exchange for waiving his Fifth Amendment privilege so undermines the suspect's capacity for self-determination that his election to waive the right and incriminate himself in criminal conduct is fatally impaired. His resulting waiver and statement are thus involuntary for Fifth Amendment purposes. These issues must be resolved on a totality-of-the-circumstances test, which places both equivocal language and technical possibilities in context. The simple result is that officers must avoid such promises, which are not proper tools of investigation.

Many years ago, addressing a Fourth Amendment issue, Justice Jackson made reference to "the often competitive enterprise of ferreting out crime." *Johnson v. United States* (1948), 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440. That competition has not lessened in the intervening years. If anything, it has grown, made even more furious by the plainly unconstitutional, if fictional, conduct of police officers portrayed in popular entertainments. That growth has increased the pressure on police officers to produce results, making the tactics they sometimes employ more aggressive. However, the more aggressive police become in questioning suspects, the greater the risk that a resulting confession is involuntary. Then, it is the sworn obligation of the courts to prevent the use of the confession in the defendant's prosecution by suppressing the confession and any other evidence derived from it.

The second assignment of error is sustained.

### Conclusion

Having sustained Petitjean's second assignment of error, we will reverse his conviction and remand the cause for further proceedings consistent with this opinion. The statements that Petitjean made to police during his interrogation of February 8, 1999, which incriminate him in Tara Latimer's death, directly or indirectly, are ordered suppressed from use by the state in any ensuing trial

proceeding. Any other evidence that derives from those statements is likewise suppressed. However, the state is not precluded from using other evidence probative of Petitjean's guilt in committing any offense arising from Tara Latimer's death so long as that evidence was obtained independent of his confessions to police.

*Judgment reversed*
*and cause remanded.*

FREDERICK N. YOUNG and GLASSER, JJ., concur.

GEORGE M. GLASSER, J., retired, of the Sixth Appellate District, sitting by assignment.