[Cite as *State v. Graham*, 2022-Ohio-2600.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 29427 |
| | : | |
| v. | : | Trial Court Case No. 2021-CR-1598 |
| | : | |
| JONATHAN GRAHAM | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of July, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellant

MICHAEL T. COLUMBUS, Atty. Reg. No. 0076799, 130 West Second Street, Suite 2103, Ohio 45402
    Attorney for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** The State of Ohio appeals from an order of the Montgomery County Court of Common Pleas, which sustained defendant-appellee Jonathan R. Graham's motion to suppress evidence. On March 18, 2022, the State filed a timely notice of appeal pursuant to R.C. 2945.67(A) and Crim.R. 12(K).

**{¶ 2}** On Friday, May 7, 2021, Graham's infant daughter, A.G., was transported by paramedics to Children's Medical Center South; she was bleeding from her mouth. At this time, A.G. was only a month and a half old. At the hospital, medical personnel determined that A.G. had a torn frenulum and fourteen broken ribs. Based upon the nature of her injuries, A.G. was transported to Children's Medical Center's main hospital campus. Montgomery County Children's Services (MCCS) contacted the Centerville Police Department (CPD) to advise them that the child's injuries appeared to be consistent with abuse.

**{¶ 3}** Later that day, three CPD officers and one MCCS caseworker interviewed Graham in a kitchenette located near the intensive care unit where A.G. was being treated. The CPD personnel were identified as Detective Steven Kocol, Detective Katie Gerspacher, and Officer Tarkany. The caseworker from MCCS was identified as Melissa Lowe. Detective Kocol testified that the purpose of the interview was to investigate a "child abuse allegation." Suppression Tr. p. 25. The interview lasted approximately two and one-half hours, and it was audiotaped but not videotaped.

**{¶ 4}** Without introducing the CPD personnel present in the room, Lowe, the MCCS

caseworker, began extensively questioning Graham regarding his background and with respect to his health, A.G.'s health, and the health of the child's mother, M.R. Lowe's questioning of Graham lasted approximately 46 minutes. During her questioning, she and the CPD personnel learned that A.G. had had health issues from birth, that Graham suffered from panic attacks and anxiety, and that M.R. suffered from postpartum depression and anxiety.

{¶ 5} After Lowe ended her questioning, Detective Kocol introduced himself and the other CPD personnel to Graham. Detective Kocol did not advise Graham of his *Miranda* rights at this time. Detectives Kocol and Gerspacher, acting in concert with Lowe, then questioned Graham about the cause of A.G.'s injuries. Graham admitted that he and M.R. were A.G.'s sole caregivers, and he acknowledged that A.G. had a torn frenulum and 14 broken ribs. Approximately one hour into the interview, Detective Kocol read Graham his *Miranda* rights from a pre-interview form. Although he stated verbally that he understood his rights, Graham did not sign or initial the form, and the questioning from Kocol, Gerspacher, and Lowe immediately continued. The recording of the interview establishes that the officers and Lowe began asking Graham a litany of questions, frequently speaking over one another. As noted by the trial court, the three individuals continually made statements to Graham such as "we understand children can be frustrating," "you have a lot on your plate," and "no one is saying you did this on purpose." For his part, Graham initially denied injuring A.G. in any way and stated that he was fully conscious of his behavior around the child.

{¶ 6} Detective Kocol informed Graham that the interview was solely for the

purpose of finding out what had happened to A.G. and "just fact-finding." Almost immediately, Lowe can be heard informing Graham that "someone hurt your baby" and "your baby is not going home with you and your wife, [M.R.] * * * until we figure out how your baby was hurt. So somebody needs to come up with something." State's Ex. 1, 1:01:50.

{¶ 7} At one point during the interview, Graham was informed by one of the interviewers that they had also interviewed A.G.'s mother, M.R. Graham was then asked if he ever got frustrated with A.G. Graham responded that of course he got frustrated, but he would never physically harm A.G. One of the interviewers then told Graham, "if you know anything else, it's best to tell us now." Graham stated that "could have" done something to A.G. "out of frustration," but he did not remember how it might have happened. Graham then reiterated that he did not know how he could have broken 14 of A.G.'s ribs. Graham stated that he had gotten frustrated with A.G. while feeding her earlier that week on Tuesday, May 4, 2021, but he did not yell at her or hurt her in any way. Graham also stated that he and M.R. had a system whereby when one of them got frustrated, they immediately handed the baby off to the other parent.

{¶ 8} Detective Kocol then informed Graham that M.R. had provided them with a video that she had recorded on her phone allegedly depicting Graham in a very agitated state at approximately 4:30 a.m. earlier that week. Graham acknowledged that he knew M.R. had been recording him that morning. Graham explained that his situation at home was very stressful and that he had been more emotional lately. Graham also stated that M.R. had become emotionally distant from him and withdrawn. However, Graham still

denied ever hurting A.G. Detective Kocol then informed Graham that M.R. had stated that she witnessed Graham shaking the baby on one occasion. Graham denied ever shaking A.G. At this point in the interview, it is apparent from the recording that Graham was beginning to get upset.

{¶ 9} The interviewers then ask Graham to speculate regarding how A.G.'s mouth had been injured. Graham replied that he did not know how A.G.'s mouth had been injured. Graham was also asked to guess how A.G.'s ribs had been broken, and he replied "squeezing." The interviewers asked Graham if that was what had happened, and he again denied hurting A.G., stating that he was always aware of his actions. Graham also speculated that he may have hurt A.G. unintentionally when he fell down the stairs while holding her. However, Graham then stated that immediately after the fall, A.G. had seemed fine and had not been crying. Graham also stated that he fed A.G. after the fall without any trouble, and he then put her to bed with no difficulty.

{¶ 10} Detective Gerspacher interjected at this point, stating that the doctors were going to provide them with a detailed report regarding A.G.'s injuries, including providing a time frame with respect to the ribs that were broken, as they were at various stages of healing. Detective Gerspacher informed Graham that the doctors were also going to provide them with photographs of A.G. that showed bruising that cannot normally be seen. Detective Gerspacher told Graham that "those photos are damning," even though the "photos" had apparently not been imaged yet for review.

{¶ 11} At this point, Lowe again advised Graham, "[A.G.] has been abused by either you or [M.R.]. One of you did it. She's not going home. The other girls will go

to their dad. [M.R.] will not be allowed to see [her] kids. You will not be allowed to the see the kids. Period!" State's Ex. 1, 1:43:20. In response, Graham stated, "If anyone did it, it was me." *Id.* at 1:43:13. One of the interviewers then immediately asked, "So are you saying you did it?" *Id.* at 1:43:20. Graham again stated that he had no idea how he could have hurt A.G. Lowe then interjected that if A.G. were released soon, neither she nor M.R.'s other daughters would be released to Graham "if still in this process." *Id.* at 1:55:00. The interviewers even mentioned that M.R. could lose her children.

{¶ 12} After approximately two hours, Graham began to cry, but the interviewers pressed forward with comments such as, "we know you know" how the injuries to A.G. occurred, and "you're not really helping yourself" by not telling us what occurred. Still crying, Graham stated, "I guess I hurt her and didn't even know it" and that he did not want to be the reason that M.R. lost her kids. *Id.* at 2:01:00. Thereafter, Graham stated that he must have unknowingly injured A.G. during one of his panic attacks when he was totally unaware of what was going on around him. *Id.* at 2:04:00. Eventually, Lowe left the room and retrieved M.R. so that Graham could speak to her. Graham apologized to M.R. when she entered the room. *Id.* at 2:15:00. Graham could then be heard apparently hyperventilating while he was crying, and the interviewers all attempted to calm him down. *Id.* at 2:16:40. Shortly thereafter, Detective Kocol ended the interview, and Graham was permitted to leave the hospital. *Id.* at 2:33:36.

{¶ 13} On May 11, 2021, Graham traveled of his own volition to the Centerville Police headquarters for a second interview scheduled by Detective Kocol at 9:00 a.m.

The second interview was held in a small interrogation room in the police station, and only Detective Kocol and Graham were present. Initially, the two men discussed Graham's treatment for his anxiety and how his weekend transpired in regard to M.R. After approximately nine minutes, Detective Kocol read Graham his *Miranda* rights, but Graham again did not sign or initial the pre-interview form. Detective Kocol then asked Graham if he was willing to answer questions. Graham eventually acknowledged that he understood his rights but was just emotional, and he continued to speak. Detective Kocol then asked Graham several questions regarding the cause of A.G.'s injuries, referencing many statements made by Graham during the first interview. Graham denied hurting A.G. and made the same speculations about the causes of A.G.'s injuries that he made in the first interview. At one point during the interview, Graham implied that M.R. could be capable of harming A.G. Detective Kocol also informed Graham that the doctor's report stated that A.G.'s injuries could not have been cause by Graham's falling down the stairs with the child in his arms because her broken ribs were in different stages of healing, indicating that the injuries all did not occur at the same time. Graham did demonstrate squeezing the baby to his chest while frustrated and preparing for a Zoom work meeting. At the end of the second interview, which lasted approximately one hour and 15 minutes, Detective Kocol handcuffed Graham and placed him under arrest.

{¶ 14} On May 18, 2021, Graham was indicted for one count of endangering children, in violation of R.C. 2919.22(A), a felony of the third degree. At his arraignment on June 1, 2021, Graham pled not guilty to the offense.

{¶ 15} On June 15, 2021, Graham filed a motion to suppress any incriminating

statements he made during the interviews conducted on May 7 and May 11, 2021. A hearing the motion to suppress was held on December 10, 2021, after which the trial court permitted the parties to file post-hearing memoranda. On January 4, 2022, the State filed a memorandum contra to Graham's motion to suppress. On January 21, 2022, Graham filed a memorandum in support of his motion to suppress. On March 14, 2022, he trial court issued a decision sustaining Graham's motion to suppress.

{¶ 16} It is from this judgment that the State now appeals.

{¶ 17} The State's first assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT FOUND THAT GRAHAM'S STATEMENTS MADE DURING THE FIRST INTERVIEW WERE INVOLUNTARILY INDUCED AND SUPPRESSED ALL STATEMENTS AS FRUIT OF THE POISONOUS TREE.

{¶ 18} The State contends that the trial court erred when it suppressed all of Graham's statements as fruit of the poisonous tree after finding that Graham's will had been overborne by CPD and MCCS personnel when he made some incriminating statements during the first interview.

{¶ 19} "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. An appellate court must "accept the trial court's factual findings as long as they are supported by competent, credible evidence." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 100. However, "we determine independently

whether the evidence satisfies the applicable legal standard." *Burnside* at ¶ 8, citing *State v. Mackey*, 2d Dist. Montgomery No. 22244, 2008-Ohio-3621, ¶ 9.

{¶ 20} The trial court held that the first interview of Graham at the hospital was noncustodial in nature and therefore *Miranda* warnings were unnecessary. Specifically, the hospital interview took place in a kitchenette in a hospital with both CPD and MCCS personnel present. The door to the kitchenette was closed but not locked. Graham was never handcuffed or placed under arrest. Based upon these considerations, the trial court found that the interview at the hospital was not a custodial interrogation. The State does not dispute the trial court's finding in this regard. Rather, the State contends that the trial court erred when it found that Graham's right to due process had been violated during the hospital interview because the CPD and MCCS personnel present engaged in coercive conduct that resulted in Graham's will being overborne, thereby rendering any incriminating statements he made involuntary and subject to suppression.

{¶ 21} Before we address the main issue, i.e., whether Graham's will was effectively overborne during the hospital interview, we must address whether Lowe was acting as a state agent by actively involving herself in the same interview. A social worker is an agent of law enforcement where the social worker acts under the direction or control of law enforcement. *State v. Bolan*, 27 Ohio St.2d 15, 18, 271 N.E.2d 839 (1971). " '[W]hether someone is acting as an agent of law enforcement is dependent upon the unique circumstances of each case.' " *State v. Jackson*, 154 Ohio St.3d 542, 2018-Ohio-2169, 116 N.E.3d 1240, ¶ 17.

{¶ 22} In *Jackson*, the Ohio Supreme Court held that a social worker's statutory

duty to cooperate and share information with law enforcement with respect to a child abuse investigation does not render the social worker an agent of law enforcement for purposes of the Fifth and Sixth Amendments to the United States Constitution when the social worker interviews an alleged perpetrator, unless other evidence demonstrates that the social worker acted at the direction or under the control of law enforcement. *Id.* at syllabus. The Supreme Court determined that, although the children services agency is statutorily obligated to cooperate with and provide information to law enforcement regarding child abuse investigations, the statute "does not mandate that agency employees interview alleged perpetrators of child abuse at the direction or under the control of law enforcement." *Id.* at ¶ 21. The Court then concluded that the social worker in *Jackson* did not act as an agent of law enforcement when interviewing the defendant where: 1) the only evidence of contact between the social worker and law enforcement about the investigation was testimony that the social worker contacted law enforcement to coordinate a joint interview of the victim; 2) there was no evidence that law enforcement asked the social worker to interview the defendant; and 3) there was no evidence that law enforcement influenced the social worker's interview of the defendant in any way. *Id.* at ¶ 23.

{¶ 23} Lowe, the MCCS caseworker in this case, was in the kitchenette with three members of law enforcement. For the first 46 minutes of the interview, Lowe asked Graham simple background questions. From that point in the interview, Lowe and Detectives Kocol and Gerspacher interchangeably asked Graham similar questions relating to the nature and cause of A.G.'s injuries. Because the interview was only audio-

recorded, at many points the record is unclear as to who was asking questions and/or talking to Graham. One thing is clear from the audio-recording of the interview: Lowe and the two CPD detectives were acting in concert ("tag-teaming" as the trial court put it) when they all actively participated in questioning Graham at the hospital. We therefore agree with the trial court that Lowe was acting as an agent of law enforcement when she questioned Graham at the hospital with the two detectives. Clearly, the line of questioning by the law enforcement officers and their inquiries certainly influenced Lowe's interjections. Thus, any questions or statements made by Lowe to Graham during the interview, in particular any statements regarding the removal of Graham's children from his or M.R.'s custody, were attributable to law enforcement.

{¶ 24} In *State v. Jackson*, 2d Dist. Greene No. 2002-CA-1, 2002-Ohio-4680, we stated:

> The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a witness against himself. The Fifth Amendment, as well as the Due Process Clause of the Fourteenth Amendment, protects against the concern that coerced confessions are inherently untrustworthy. *State v. Marks*, 2d Dist. Montgomery No. 19629, 2003-Ohio-4205, ¶ 34, citing *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt * * * but a confession forced from the mind by the

flattery of hope, or by the torture of fear, comes in so questionable a shape * * * that no credit ought to be given to it." *Id.* at 433.

A suspect may waive his constitutional right against self-incrimination, provided that waiver is voluntary. A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515; *State v. Otte*, 74 Ohio St.3d 555, 660 N.E.2d 711, 1996-Ohio-108.

The issues of whether a confession is voluntary, and whether a suspect has been subjected to custodial interrogation so as to require *Miranda* warnings, are analytically separate issues. * * * The due process clause continues to require an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession. *Dickerson* at 434. This due process test takes into consideration the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation. *Id.* Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements.

* * * If *all* of the attendant circumstances indicate that the confession

was coerced or compelled, it cannot be used to convict the defendant. That determination depends upon a weighing of the pressure to confess against the power of resistance of the person confessing. *Id.*

(Emphasis added.) *Id.* at ¶ 19-22.

{¶ 25} A noncustodial situation is not converted to one in which *Miranda* applies where a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a coercive environment. *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *see also California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). The rationale for this is that any interview of a crime suspect by a police officer will have coercive aspects to it by virtue of the fact that the police officer is part of the law enforcement system which may ultimately cause the suspect to be charged with the crime. *Id.*

{¶ 26} However, "[w]hen a confession is forced from the mind by the flattery of hope or by the torture of fear, it is unreliable and no credit ought to be given to it. Promises or suggestions of leniency in exchange for waiving the Fifth Amendment privilege create a flattery of hope, which is made even more powerful by the torture of fear that accompanying threats of punishment induce in the mind of the accused." *State v. Petitjean,* 140 Ohio App.3d 517, 528, 748 N.E.2d 133 (2d Dist. 2000).

{¶ 27} In *State v. Russell*, 2d Dist. Clark No. 2011-CA-10, 2012-Ohio-4316, we stated the following:

"The line to be drawn between permissible police conduct and

conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. * * *

"When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (Citations omitted.)

*Id*. at ¶ 22, citing *State v. Jackson*, 2d Dist. Greene No. 2002-CA-1, 2002-Ohio-4680.

**{¶ 28}** " 'To support a determination that a confession was coerced, the evidence must establish that: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) defendant's will was, in fact, overborne as a result of the coercive police activity.' " *State v. Humphrey*, 4th Dist. Ross No. 10CA3150, 2010-Ohio-5950, ¶ 18, *vacated on other grounds*, 128 Ohio St.3d 397, 2011-Ohio-1426, 944 N.E.2d 1172, quoting *United States v. Rigsby*, 943 F.2d 631, 635

(6th Cir.1991).

{¶ 29} As previously stated, the trial court found that the CPD and MCCS personnel engaged in coercive tactics that overbore Graham's will when they discussed the removal of his children from his and M.R.'s custody as a result of the criminal investigation into who caused A.G.'s injuries. Specifically, the trial court relied on the following statements made by Lowe during the interview:

"[S]omeone hurt your baby" and "[Y]our baby is not going home with you and your wife, [M.R.]…..until we figure out how your baby was hurt. So somebody needs to come up with something." State's Ex. 1, 1:01:50.

* * *

"[A.G.] has been abused by either you or [M.R.]. One of you did it. She's not going home. The other girls will go to their dad. [M.R.] will not be allowed to see [her] kids. You will not be allowed to the see the kids. Period!" State's Ex. 1, 1:43:20.

* * *

Lowe also stated that if A.G. is released soon, neither she nor M.R.'s other daughters would be released to Graham "if still in this process." State's Ex. 1, 1:55:00.

{¶ 30} These statements had coercive aspects to them. However, we conclude that the statements were insufficient as a matter of law to overbear Graham's will. The alleged "threats" made by Lowe and the other interviewers were not of a punitive nature nor unfounded. The statements in question regarding the custody of Graham's and

M.R.'s children were accurate statements regarding child placement in at least a temporary safety plan. A.G. was clearly the victim of abuse, suffering 14 broken ribs and a torn frenulum. Graham and M.R. were A.G.'s sole caretakers. It is undisputed that part of MCCS's investigation into who caused the injuries would initially necessitate the removal of A.G. and possibly the other children from Graham and M.R.'s household. Specifically, in any case where a child has allegedly been abused and one of the parents is named as a suspect, MCCS would be required to establish a safety plan requiring the placement of the child outside the home temporarily and independent of any ongoing criminal investigation. Concerns regarding the two additional young children were also legitimate. Simply put, removal of the children was part of the MCCS process and did not rise to the level of a threat that would invalidate Graham's statements.

{¶ 31} In support of its finding that Graham's will was overborne, the trial court relied on our previous decision in *Petitjean*, 140 Ohio App.3d 517, 748 N.E.2d 133. In *Petitjean*, we state:

> " * * * [F]alse promises made by police to a criminal suspect that he can obtain lenient treatment in exchange for waiving his Fifth Amendment privilege so undermines the suspect's capacity for self-determination that his election to waive the right and incriminate himself in criminal conduct is fatally impaired. His resulting waiver and statement are thus involuntary for Fifth Amendment purposes. These issues must be resolved on a totality-of-the-circumstances test, which places both equivocal language and technical possibilities in context.

*Id*. at 534.

{¶ 32} In *Petitjean*, interrogating officers warned the defendant that he was facing a murder charge and that, if officers had to gather evidence through investigation, " 'you go bye-bye for a big long * * * time—for life or you lose your life.' " *Id*. at 529. The officers promised, on the other hand, that " 'if you want to work with us and work with yourself, * * * you'd probably get two years of probation.' " *Id*. at 530. We determined that "[t]his specifically conditioned the availability of probation on Petitjean's waiver of his Fifth Amendment privilege. That assurance of leniency was a misstatement of the law that so undermined Petitjean's calculus that it critically affected his capacity for self-determination." *Id*. at 532.

{¶ 33} *Petitjean* is distinguishable from Graham's case because the custody of A.G. and the other children was not a law enforcement matter. MCCS was already involved in the case at the time of first interview, and the removal of the children from Graham and/or M.R.'s custody was not conditioned upon his cooperation or confession in his criminal case.

{¶ 34} The trial court also relied on a case from the U.S. Supreme Court, *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), to support its conclusion that threatening to take a suspect's child away was an unlawful, coercive police tactic. However, *Lynumn* is distinguishable. In *Lynumn*, the Supreme Court overturned a conviction for unlawful marijuana use that was based in part on a confession that the police obtained by threatening the defendant that unless she "cooperated," they would take her children from her and stop the state's financial aid to the children. Second, the

threats, the length of the interrogation, her pregnancy, and the officers' promises to let her see her children if she cooperated combined to create an unduly coercive atmosphere for any defendant. Third, Lynumn was particularly vulnerable to coercion because of her pregnancy and her status as a mother of four young children. Conversely, Lowe's statements regarding the protective custody of the children were *not* conditioned upon Graham's cooperation with the police. MCCS was going to develop a safety plan for A.G. and the other children whether Graham cooperated or not. In our view, the record is devoid of any evidence of unlawful threats or inducements from law enforcement that would support a finding that Graham's will was overborne.

{¶ 35} The trial court also found that the police conduct in Graham's case was coercive for the following reasons: 1) the police knew Graham suffered from panic attacks; 2) the police asked him questions in a "tag-teaming" style; 3) they assured him he was not alone; and 4) although x-ray imaging of A.G.'s injuries had not yet been completed, the police told him that the doctors could take images that depicted hand prints and bruising and described those types of images as "damning."

{¶ 36} With respect to Graham's anxiety and panic attacks, the Supreme Court of Ohio has held that mental illness, absent coercive police activity, is not a sufficient basis for excluding a defendant's statement. Therefore, the voluntariness of Graham's statement depended on whether the police engaged in coercion and misconduct, not whether he was mentally ill. *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 69; *see also Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In any event, there was no evidence in the record that Graham

was mentally ill. In regard to Graham's being "tag-teamed" by the interviewers, the audio-recording of the hospital interview establishes that there were times at which the interviewers were speaking over one another. At the time of the interview, Graham was approximately 30 years old, well-educated, employed as an integration engineer in the information technology field, and had no prior criminal history. Furthermore, the audio-recording establishes that Graham was given ample opportunity to speak and answer the questions posed to him by the interviewers. Notably, Detective Kocol testified that he believed that it was possible that Graham had felt "intimidated" during the interview, but the interrogation process, as previously stated, is inherently high pressure in nature and unquestionably intimidating in some respects.

{¶ 37} We also fail to see how reassuring Graham that he was "not alone" regarding getting frustrated with his children was commensurate with coercive police conduct. Finally, when Detective Gerspacher stated that the medical imaging that doctors perform in child abuse cases was "damning," the context in which the statement was made establishes that she was speaking generally in regard to her own knowledge as a police detective with five years of experience.

{¶ 38} Lastly, at the end of the hospital interview, Graham thanked Detective Kocol for being patient with him. Graham also asked Lowe to stay in the room with him after M.R. was brought in the kitchenette to talk. We find that Graham's conduct in this regard was not indicative that his will had been overborne by the interviewers' questioning. In light of the foregoing, we find that the trial court erred when it suppressed all of Graham's statements from the first interview.

{¶ 39} The State's first assignment of error is sustained.

{¶ 40} The State's second assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT HELD THAT GRAHAM WAS IN CUSTODY AT THE POLICE STATION AND WHEN IT HELD THAT GRAHAM'S STATEMENTS TO DETECTIVE KOCOL WERE NOT THE RESULT OF AN INFORMED CHOICE AFTER HE RECEIVED AND WAIVED HIS *MIRANDA* RIGHTS.

{¶ 41} In its second assignment, the State argues that the trial court erred when it held that Graham was in custody at the police station for the purposes of *Miranda*. The State contends that the trial court also erred when it held that, because the statements made by Graham in the hospital interview were involuntary due to coercive police conduct, his waiver of his *Miranda* rights during the interview at the police station was involuntary as well.

{¶ 42} Significantly, the trial court found that, but for the taint of his involuntary statements from the first interview, Graham's *Miranda* waiver at the police station was otherwise "knowing and intelligent." Order p. 15. Since we find that Graham's statements from the first interview were voluntary and not made in violation of his due process rights, they did not taint or render his *Miranda* waiver from the second interview invalid. Furthermore, we need not address the custodial nature of the second interview, because the record supports a knowing, intelligent, and voluntary *Miranda* waiver during the second interview. The interview was relatively brief, cordial, and non-coercive, as evidenced by the video. Thus, any statements Graham made to Detective Kocol at the

police station after waiving his rights and agreeing to speak to him were *not* subject to suppression.

{¶ 43} The State's second assignment of error is sustained.

{¶ 44} The State's assignments of error having been sustained, the order of the trial court is reversed, and this matter is remanded for further proceedings.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Michael T. Columbus
Hon. Susan D. Solle