OPINION
Defendant, Kevin K. Waldo, appeals from his convictions on two counts of attempted rape and the concurrent, four year sentences imposed on those conviction. The two convictions were entered on verdicts of guilty by the court after a trial to the bench, the Defendant having waived his right to trial by jury. The court had previously denied Defendant's motion to suppress evidence of incriminating statements he made to police., Defendant resided in a home in Urbana with Mike and Kathy L., their three young daughters, and several other adults. On the evening of July 25, 1999, Defendant and several of the other residents drank and "partied" for several hours. During the later early morning hours, one of the young girls, A.L., then age seven, was heard to cry from the room where she and her sisters were sleeping. Another of the residents, Chad Collins, went to the room and found Defendant Waldo. Upon inquiry, the child said that Defendant had "messed" with her by touching her "private." It soon became clear that she was suggesting digital penetration of her vagina.
Police were called and Defendant was taken into custody. Upon interrogation, he at first denied wrongdoing, then admitted that he had perhaps touched the victim's vaginal area. He was subsequently charged by indictment with two counts of rape of a child less than thirteen years of age. One count concerned the events described above. The other involved similar conduct that allegedly had occurred several weeks earlier.
Defendant moved to suppress his incriminating statements from use by the State at trial. The trial court denied the motion. The Defendant waived his right to a jury trial and was tried by the court. Numerous witnesses who were in the house that night testified, along with the victim. A medical expert and a psychologist also testified. Defendant testified, denying any wrongdoing. Defendant was convicted of two counts attempted rape. He was sentenced to serve two concurrent four year sentences., Defendant filed a notice of appeal. His counsel filed an Anders brief. We rejected the brief upon a finding that colorable error might exist and we assigned new counsel, who has filed a brief containing five assignments of error.
 FIRST ASSIGNMENT OF ERROR THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN FAILING TO SUPPRESS STATEMENTS MADE BY THE APPELLANT TO LAW ENFORCEMENT OFFICIALS WHILE APPELLANT WAS CUSTODIALLY INTERROGATED.
The evidence presented at the suppression hearing demonstrates that on July 25, 1999, at approximately 4:00 a.m., Urbana police officers were dispatched to a residence on South Main Street on a complaint of sexual assault. The alleged victim was a seven year old female, A.L. Upon arrival, police encountered various members of the victim's family and the Defendant. After speaking with family members, police took Defendant, Kevin K. Waldo, into custody for questioning. Defendant was advised of his Miranda rights at the scene, and was then transported to the police station and placed in an interview room.
At approximately 4:30 a.m. Officer Cordial began a videotaped interview of the Defendant. Officer Cordial first re-read Defendant's rights to him from a pre-interview form. Defendant indicated that he understood his rights and he signed the waiver of rights portion of the form., Defendant is twenty-one years old. He had no prior experience with the criminal justice system. According to his own testimony and the testimony of Officer Cordial at the suppression hearing, Defendant was intoxicated at the time Officer Cordial questioned him during the early hours on the morning of July 25, 1999., Defendant made no incriminating statements during his initial questioning by Officer Cordial. Defendant said he had heard A.L. crying and that he went into her bedroom to learn why she was crying. Defendant stated that he did not remember what then happened because he was too drunk at the time. Officer Cordial informed Defendant that the victim said he had touched her private parts, but that produced no incriminating admissions from Defendant.
Officer Cordial next told Defendant that recent advances in forensic science and technology had produced a test that could be run on Cordial's hands, which had earlier come in contact with Defendant's hands during handcuffing. According to the officer, this test would detect body fluids from the victim, the presence of which would confirm Defendant's involvement in the sexual activity alleged. When this didn't produce any admissions from Defendant, Officer Cordial left the room, saying he was leaving to have the test run. Officer Cordial returned ten or fifteen minutes later and told Defendant that the test was positive, indicating he was involved in the sexual assault. (There was, of course, no such test available and no test was performed.) Still, Defendant did not make any incriminating statements.
At that point, Officer Cordial left the interview room. Shortly before 5:00 a.m., another Urbana police officer, Erin Pittsenbarger, entered the room, identified himself to Defendant, and resumed the questioning. Officer Pittsenbarger did not re-advise Defendant of his rights because he was aware that Defendant was previously advised of his rights and had waived them., Defendant continued to deny any wrongdoing during his questioning by Officer Pittsenbarger. Defendant claimed that he did not touch the victim, that when he heard her crying he believed she was dreaming, and when he went into her room she began screaming for her Uncle Chad. According to Defendant, he had been drinking and that is all he remembered. Defendant stated that the whole thing was some kind of misunderstanding. At that point, Officer Pittsenbarger left the interview room.
When Officer Pittsenbarger returned he suggested that perhaps Defendant had simply tried to comfort the child when he heard her crying. Defendant told Officer Pittsenbarger "I been drinking since about 10:00 and I really need to pee." T. 14). Officer Pittsenbarger responded: "I understand that, but I want to get this taken care of, then we'll let you go." (T. 14). After further questioning, Defendant stated: "Maybe I was trying to comfort her. Maybe I put my hand down there and didn't even recognize it at the time. All I remember was trying to comfort her and someone choking me half to death until police came." (T. 14).
After still further questions, Defendant stated: "I went in there, she was crying. I tried to comfort her. Maybe I just laid my hand on there, I don't know." (T. 16). When Officer Pittsenbarger asked Defendant if he had inserted his fingers inside the girl, Defendant replied: "I really don't remember. I had been drinking heavily. I don't remember if I did that or not." (T. 17). The following colloquy then ensued:
Q. Would you be surprised if I told you that you had?
A. I don't know.
 Q. Okay. So you're telling me you went in there and you laid your hands on her, put your hands between her legs. Explain to me where — where your hand was.
 A. I don't know. I guess around (unintelligible) or something. I was trying to cover her up. (Unintelligible) then she was crying for Chad.
 Q. All right, Kevin, I'm going to let you go use the bathroom, and then I'll come back in just a second.
(T. 17-18).
When the interrogation resumed, Defendant continued to deny any recollection of touching the child. When the officer persisted in his suggestions that it may have happened, Defendant conceded that "maybe" it had. (T. 19). Officer Pittsenbarger stated: "So what you are telling me is you just touched her private?" Defendant responded, "I guess." (T. 21.) When then asked how he had touched the victim, Defendant said, "I don't remember." (T. 21).When Officer Pittsenbarger asked Defendant to re-affirm that he had remembered touching the victim, Defendant said that was "Possible." (T. 21). Defendant indicated he was tired, and the interview ended shortly thereafter.
About three hours had elapsed from the time Defendant was first placed into the interview room until the interview terminated and Defendant was taken to jail. Approximately one hour of that time involved active questioning of Defendant by the police.
A suspect's decision to waive his Fifth Amendment privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. State v. Otte (1996),74 Ohio St.3d 555; State v. Petitjean (2000), 140 Ohio App.3d 517. Coercive police activity is a necessary predicate to finding a confession involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment. State v. Wiles (1991), 59 Ohio St.3d 71.
The voluntary nature of a defendant's statement is determined from the totality of the circumstances. State v. Slagle (1992), 65 Ohio St.3d 597; State v. Treesh (2001), 90 Ohio St.3d 460. A confession is involuntary if, on the totality of the circumstances, the defendant's will was overborne by the circumstances surrounding his giving of the confession. Dickerson v. United States (2000), 530 U.S. 428, 120 S.Ct. 2326,147 L.Ed.2d 405; Petitjean, supra.
The totality of the circumstances test takes into consideration both the characteristics of the accused and the details of the interrogation. Petitjean, supra. Factors to be considered include the age, mentality and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. State v. Edwards (1976), 49 Ohio St.2d 31 . Use of deceit by the interrogating police officers and misrepresentations made to the suspect about the evidence police possess do not per se render a confession involuntary, per se. Rather, it is but one factor bearing on voluntariness. State v. Cooey (1989), 46 Ohio St.3d 20., Defendant argues that the totality of the circumstances surrounding his confession, which includes his relatively young age, his lack of experience with the police, the fact that he was intoxicated and had not slept all night, the fact that police lied to him about a fictitious test which indicated he was guilty, and the fact that police refused to allow him to use the restroom to relieve himself for some eight to ten minutes after he stated he needed to, constitute coercive police activity which rendered his inculpatory statements involuntary.
Whether an accused's confession was voluntary for purposes of the Fifth Amendment presents a question of law. An appellate court reviews that issue de novo, not being bound by the trial court's judgment on the same legal issue. The appellate court must give strong deference to the trial court's findings of the facts which underlie a claim of involuntariness.
The trial court made no findings of fact when it denied the Defendant's motion to suppress. Indeed, the facts involved in his interrogation, which are evidenced by the videotape of that procedure and the transcript thereof, are not in dispute. Further, the principal facts on which Defendant-Appellant relies were confirmed by the officers who interrogated him in their testimony in the hearing on the motion to suppress.
While the Defendant had been "Mirandized" not once, but twice, Miranda warnings do not foreclose a further inquiry whether a defendant's will was overborne by the circumstances surrounding the giving of a confession. Dickerson v. United States, supra. The focus of that inquiry is whether police overreaching during the interrogation process was such as to overbear the defendant's will to resist and bring about a confession which is involuntary because it was not freely self-determined. Colorado v. Connelly (1986), 479 U.S. 157,107 S.Ct. 515; 93 L.Ed. 473; State v. Edwards, supra.
We conclude that, on the totality of the facts and circumstances of his interrogation by police, Defendant Waldo's incriminating admissions were rendered involuntary by conduct which constitutes police overreaching. The following support that conclusion.
First, as evidenced by the time-stamps imprinted on the videotape, Defendant's interrogation commenced at approximately 4:30 a.m. and involved active questioning for about one hour. Defendant was tired and disoriented from a lack of sleep. Why police questioned Defendant when they did, not waiting until later that day, is unexplained.
Second, Defendant was intoxicated when he was questioned. Defendant claimed that he was, and Officer Cordial testified at the suppression hearing that Defendant was "intoxicated" when he was questioned. (T. 6)
Third, police refused Defendant's request to use a restroom when he said that he had a strong need to urinate, having been drinking the evening before. Instead, they told him that they "want to get this taken care of, then we'll let you go." Defendant was not allowed to relieve himself until eight to ten minutes later. Officer Pittsenbarger confirmed that fact at the suppression hearing. (T. 14). This demonstrates the kind of physical deprivation condemned by Connelly and Edwards, supra. Significantly, the Defendant's first incriminating statement was not made until after he asked to be allowed to relieve himself and that request was denied.
Fourth, the bogus "hand test" police said could be used to prove that he had contact with the victim had the capacity to deceive Defendant. Officer Cordial confirmed that it was a lie. (T. 6). Such deceit is a problem if it causes an accused to admit to something he did not do. Pettijean, supra. It may also be a problem if it overbears an accused's will to resist admitting something he did. In view of Defendant's persistent denial of any recollection of what had happened, the particular deceit police used in this instance had the capacity to persuade him that maybe their accusations were true, even if he did not know whether they were.
Fifth, the Defendant, who was but twenty years of age and had no prior contact with the criminal justice system (T. 17), contact that might have balanced-off the coercive effect of these matters. Such contact is assumed to create some basis in experience that allows a defendant to resist police overreaching. Defendant had none.
The foregoing circumstances, in their totality, cause us to conclude that the incriminating statements produced by the Defendant's interrogation were involuntary for Fifth Amendment purposes. Per Dickerson, supra, their use by the State to convict him was a violation of his rights of due process guaranteed by the Fourteenth Amendment. Therefore, the trial court erred when it denied Defendant's motion to suppress that evidence and permitted the State to introduce it at Defendant's trial.
The first assignment of error is sustained.
 THIRD ASSIGNMENT OF ERROR APPELLANT WAS DENIED HIS CONSTITUTIONAL AND STATUTORY RIGHTS TO BE PRESENT DURING ALL STAGES OF THE TRIAL.
Defendant argues that his absence from the in-chambers hearing conducted by the trial court to determine whether the child-victim in this case was competent to testify at trial violated his constitutional right to be present at every stage of his criminal proceeding.
At the outset, we note that Defendant made no request to be allowed to be present and no objection to his absence from the hearing. Hence, error in that regard has been waived, and reversible error can only be in the nature of plain error.
The record demonstrates that Defendant's attorney was present during this hearing. No substantive questions relating to Defendant's guilt were asked of the child-victim during the hearing. Rather, the questions posed to the child related to the child's ability to perceive, remember and relate facts, her ability to distinguish between the truth and a lie, and the child's sense of her obligation to tell the truth. When the child testified in court during the trial, Defendant was present with his counsel and able to consult with his counsel during cross-examination of the child.
Under these circumstances, excluding Defendant from the hearing to determine the child's competency to testify did not violate either Defendant's confrontation or due process rights. Kentucky v. Stincer (1987), 482 U.S. 730; State v. Green (2000), 90 Ohio St.3d 352.
The third assignment of error is overruled., Defendant's remaining assignments of error have been rendered moot by our disposition of the first assignment of error.
Defendant's convictions and designation as a sexual predator will be reversed, and this cause remanded to the trial court for further proceedings consistent with this opinion.
WOLFF, P.J. and YOUNG, J., concur.