OPINION
Defendant-appellant, Robert J. Caulley, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, finding him guilty of one count of murder and one count of manslaughter arising out of the death of Charles and Lois Caulley, appellant's parents.
Charles and Lois Caulley were found bludgeoned and stabbed to death in their home on Stringtown Road in Grove City, Ohio, on Sunday, January 16, 1994. The deaths were reported in a 9-1-1 telephone call made by appellant, who explained that he had gone to his parents house and found them dead. At the time of the elder Caulleys' death, appellant was employed by his father in the family plumbing business, C.J. Caulley Plumbing. A lengthy and extensive investigation by the Franklin County Sheriff's office was unable to develop any physical evidence from which to conclusively link anyone to the murder. No fingerprints were found on the knives used in the slayings, no footprints detected other than those of the EMT personnel, and no witnesses were found. Investigating officers pursued several leads provided by tipsters, without success.
The investigating officers, however, remained suspicious of appellant even while the investigation otherwise stalled for nearly three years. The suspicions developed because of several perceived inconsistencies between statements given by appellant after the murders. In addition, several persons had noted that after the murders, appellant had a scratch on his face and a bruise on his neck which looked like a thumb print. Appellant explained the scratch by stating that his young son had caused it. Authorities further concluded that appellant had both the opportunity and motive to commit the crime, based upon disagreements with his father over the future of the plumbing business, the fact that appellant had, along with his two sisters, inherited substantial amounts of money upon his parents' death, and that appellant's sole alibi on the presumed night of the murder was provided by his wife.
Almost three years after the murders, in December 1996, Franklin County Sheriff's Detective Zachary Scott and Sergeant Tony Rich flew to Houston, Texas, where appellant was employed as an aeronautical engineer with Continental Airlines. They went to appellant's workplace and requested that he voluntarily come to the Harris County (Houston) Sheriff's office for an interview. Appellant was transported in the officers' car and the interview began at approximately 3:20 p.m. on the afternoon of December 3, 1996. After a lengthy interview, which was punctuated by the arrival of appellant's wife, appellant, over the vigorous protestations of his wife, produced an incriminating statement which was tape-recorded by the officers. Appellant stated that he had gone to his parent's home after attending a hockey game on the night of Friday, January 14, 1994, where a discussion with his father deteriorated into a confrontation, during which his father pushed appellant causing him to fall onto and break a table. According to appellant's statement, the argument thereafter escalated until appellant hit his father with a baseball bat and then stabbed him. When appellant's mother intervened, he struck and stabbed her as well.
After appellant made his statement in Houston, the interviewing officers telephoned Franklin County Assistant Prosecutor Dan Hogan, who advised them that appellant could be arrested based upon his statement. Appellant waived extradition and was returned to Columbus the following day.
Appellant's wife also flew to Columbus shortly thereafter. Again on the advice of Assistant Prosecutor Hogan, she was subsequently arrested by the investigating officers for obstruction of justice, based upon her prior statements providing an alibi for appellant on the night of the murders. The investigating officers attempted to use Celeste Caulley's arrest as leverage to encourage appellant, who in the interim had refused to give a more detailed statement, to resume his dialogue with the investigating officers. Celeste Caulley was soon thereafter released and the charges against her dropped upon the personal intervention of Assistant Prosecutor Hogan. No further incriminating statements by appellant appear to have emerged from this particular phase of the investigation.
Appellant was initially charged with two counts of aggravated murder with death penalty specifications and one count of aggravated robbery. Counsel for appellant duly filed a motion to suppress the incriminating statement made by appellant in the Houston interview, based upon violation of the right to counsel and the generally coercive nature of the interview. The trial court held an extensive suppression hearing prior to trial and ruled that the statement was admissible.
The matter thereafter proceeded to trial before a jury. The evidence introduced by the prosecution consisted first and foremost of appellant's confession given to the investigating detectives in Houston, in the form of an audiotape and a transcript. In addition, the prosecution presented testimony and other evidence intended to buttress the confession by demonstrating that the physical characteristics of the crime scene conformed to appellant's description in his confession as to how he committed the killings, and to demonstrate that appellant's personal, financial and career circumstances, as well as his strained relationship with his father and mother, gave him a motive to commit the murders.
The principal witness for the prosecution was Detective Scott, who testified extensively regarding the circumstances surrounding appellant's confession when interviewed in Houston. Detective Scott also testified generally about the course of the investigation immediately after the murders and over the three years that intervened between the crimes and appellant's confession. On cross-examination, Detective Scott agreed that during the course of his lengthy investigation he had been unable to establish any physical evidence linking appellant or anyone else to the crime, and that his continued suspicion of appellant was based principally upon apparent financial motive and appellant's reportedly strained relationship with his father. This belief on the part of Detective Scott had been reinforced when he sought assistance from the FBI in developing a profile of the killer.
The state also presented the testimony of former Assistant Prosecutor Dan Hogan, who, in the interim, had taken a seat on the bench of the Franklin County Common Pleas Court. Judge Hogan testified extensively in order to explain his interaction with the investigating detectives during appellant's interview, arrest, and subsequent detention upon being transported to Columbus.
In addition, the state presented testimony of former employees of C.J. Caulley Plumbing, who generally described appellant as not particularly suited for the physical side of the plumbing business. Steve Young, a former employee and master plumber, stated that he had left the business when appellant returned to Columbus and began working for his father full time. Young testified that he had previously turned down an offer to buy the business himself and did not care to "carry" appellant if appellant took over the business.
Several friends of the victims also testified regarding the generally peaceful and well-regulated lives of the deceased couple, and their sometimes strained relationship with their children, including appellant and his wife. Friends also testified about the activities of the victims on the night of Friday, January 14, 1994, the night on which the prosecution postulated that the murders occurred, upon the victims returning to their home at approximately midnight.
Forensic Pathologist Patrick Fardal, of the Franklin County Corner's office, testified that he examined the victims on Sunday, January 16, 1994, the day they were found dead. Dr. Fardal concluded that both victims died from a combination of stab wounds and blunt instrument trauma to the head, although the precise cause of death could not be isolated in either case, as any number of individual blows or wounds could have proved fatal. Dr. Fardal's best estimate of the time of death, however, did not completely coincide with the prosecution's theory that the victims had been killed late Friday or early Saturday morning prior to being found; with respect to Mr. Caulley, Dr. Fardal concluded that he had died eight to twelve hours before examination on Sunday, and with respect to Mrs. Caulley, more than two and less than twelve hours before examination. For both victims this would have put the time of death between late Saturday night and early Sunday morning.
The prosecution also presented, over objection, the testimony of Todd Elkins, a prisoner formerly held in the Franklin County Jail with appellant. Elkins testified that appellant had stated that he wished to kill the assistant prosecutor in his case and had offered Elkins $10,000 to do so. Elkins testified that appellant planned to profit from the resultant delay in trial to obtain bond and flee.
Defendant testified on his own behalf, stating that he had not gone to his parents' home between leaving work Friday afternoon and discovering the bodies on Sunday morning, when he went to their home to borrow a tool. He stated that he had gone straight home after the hockey game Friday night, and subsequent testimony by his wife Celeste supported this alibi. Appellant described his interview with Detective Scott and Sergeant Rich in Houston, and stated that his confession in Houston was completely untrue and that he had only told the deputies what they seemed to want to hear in order to gain time to consult an attorney and avoid being indicted on aggravated murder charges, as the deputies had threatened to do.
The defense also presented the testimony of Dr. Richard Ofshe, described as an expert on the field of interrogation, and particularly on the production of false or unreliable confessions induced by certain interrogation techniques. Dr. Ofshe even-tually opined that the techniques employed by the investigating officers in the present case produced a strong likelihood of unreliable or false confession.
The jury ultimately rejected the aggravated murder charges, but returned verdicts finding appellant guilty of murder in the death of his mother and voluntary manslaughter in the death of his father. The jury found appellant not guilty of aggravated robbery. Appellant was sentenced to fifteen years to life on the murder conviction and ten to twenty-five years imprisonment on the manslaughter conviction, to be served consecutively.
Since appellant's sentencing on October 20, 1997, the present appeal has been considerably delayed by disputes over whether appellant is entitled to appointed counsel due to his alleged indigency. These questions were addressed by this court in State v. Caulley (Sept. 9, 1999), Franklin App. No. 98AP-74, unreported, and the matter is now finally before us on appellant's direct criminal appeal. Appellant brings the following seven assignments of error:
ASSIGNMENT OF ERROR ONE
 (a) WHEN TESTIMONY AT A MOTION TO SUPPRESS HEARING SHOWS THE ACCUSED REQUESTED AN ATTORNEY DURING CUSTODIAL INTERROGATION, AND NONE WAS PROVIDED, THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS THE STATEMENT, CONTRA THE FIFTH, SIXTH AND FOUR-TEENTH AMENDMENTS TO THE CONSTITUTION.
 (b) WHEN TESTIMONY AT A MOTION TO SUPPRESS HEARING SHOWS THE ACCUSED INVOKED HIS RIGHT TO COUNSEL DURING INTERROGATION BY LAW ENFORCEMENT OFFICIALS, THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS THE STATEMENT, CONTRA THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 ASSIGNMENT OF ERROR TWO WHEN AN ASSISTANT PROSECUTOR TESTIFIES IN THE CASE IN CHIEF, AND DETAILS THE ADVICE HE GAVE DETECTIVES DURING THE ARREST STAGES OF THE CASE, THE RESULTING EFFECT WAS CONTRA THE FAIR TRIAL RIGHTS OF THE ACCUSED, UNDER THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 ASSIGNMENT OF ERROR THREE (a) WHEN TESTIMONY IS INTRODUCED BY THE PROSE-CUTION THAT CLAIMS THE ACCUSED WAS INVOLVED IN A CONSPIRACY TO HARM THE ASSISTANT PROSE-CUTOR, AND THAT CLAIM IS SHOWN TO BE UTTERLY GROUNDLESS, THE ACCUSED DOES NOT RECEIVE A FAIR TRIAL, CONTRA THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 (b) EVIDENCE OF THREATS CLAIMED TO BE MADE BY THE ACCUSED AGAINST THE ASSISTANT PROSECUTOR, SHOWN TO BE GROUNDLESS, ARE IMPROPER AS A MATTER OF LAW, CONTRA THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 ASSIGNMENT OF ERROR FOUR WHERE THE RECORD AT PRE-TRIAL SHOWS THE DEFENSE SPECIFICALLY REQUESTED CERTAIN EXCULPATORY MATERIAL FROM THE PROSECUTION, AND IT IS SUBSEQUENTLY DETERMINED THE PROSECUTION DID NOT SUPPLY SAID MATERIAL, THE EFFECT IS TO DENY THE ACCUSED A FAIR TRIAL UNDER THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 ASSIGNMENT OF ERROR FIVE EVIDENCE OF PLEA NEGOTIATIONS IS INADMISSIBLE IN A JURY TRIAL; WHERE THE PROSECTION INTRODUCES DETAILED TESTIMONY OF PLEA NEGOTI-ATIONS, THE EFFECT IS CONTRA THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS AND EVID. R. 410 (a) (5).
 ASSIGNMENT OF ERROR SIX WHERE THE RECORD REVEALS THAT THE CON-FESSION WAS INVOLUNTARY, THE ERROR IN AD-MITTING IT AT TRIAL RESULTED IN A VIOLATION OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION.
 ASSIGNMENT OF ERROR SEVEN DURING DELIBERATIONS THE TRIAL COURT COMMITS ERROR IN ALLOWING THE TAPE TO BE VIEWED ON NUMEROUS OCCASIONS BY THE JURY, OVER THE OBJECTIONS OF THE DEFENSE, THEREBY UNDULY EMPHASIZING THAT PARTICULAR EXHIBIT CONTRA THE SIXTH AMENDMENT.
Appellant's first and sixth assignments of error both address the admissibility of appellant's confession and allege error on the part of the trial court in failing to suppress the confession. These two assignments of error will accordingly be addressed together. Three principal issues are raised therein: whether appellant was in custody at the time of his interview by investigating deputies and, accordingly, whether appellant had a right to counsel; whether appellant invoked that right to counsel and was nonetheless subjected to additional questioning which resulted in his confession; and whether appellant was subjected to such coercion or improper influence during the course of his interview that his confession was not free and voluntary.
Although the accounts given by witnesses for the prosecution and defense at the suppression hearing differed in some respects, there were many similarities. Detective Scott and Sergeant Rich gave their account of the interview with appellant in Texas that resulted in his confession. According to the investigating officers, they traveled to Houston because they had located appellant's residence there, and appellant remained the primary suspect in the murder of his parents. Upon arriving, they contacted the Harris County Sheriff's office and arranged to use local facilities, if necessary, in an interview of appellant. Local authorities furnished a car and driver and the officers went to appellant's place of work at Continental Airlines' maintenance facility. The officers deliberately did not call ahead to announce their arrival because they wanted to catch appellant unprepared.
The officers initially did not tell appellant that he was the principal suspect in the case, and merely informed him that they would want him to come to the Harris County Sheriff's office and speak to them about the case. Appellant agreed and the investigating officers and appellant returned to a previously arranged conference room at the sheriff's office.
The officers began by giving appellant a breakdown of the evidence in the case and advised appellant to again go over his account of how he had discovered the bodies on Sunday morning. Sergeant Rich read appellant his constitutional rights "as a courtesy," and appellant executed a waiver of his rights. The officers told appellant that he was not in fact in custody and was free to go at anytime, and appellant indicated that he understood this.
As the questioning went on, the officers developed their lack of leads in the case, and their theory that the physical evidence at the scene pointed to a burglary having been staged. The officers pointed out that it was particularly suspicious that some jewelry and cash in plain sight had not been taken, and that the valuables which appeared to have been stacked up near the front door by the burglar or burglars presented items of little value. The officers also pointed out that the manner in which the victims were killed did not correspond to the probable actions of a burglar surprised in the middle of his crime, but, rather, indicated that the killer had acted in a fit of rage. The extreme cold on the night in question also argued against the possibility of a burglary.
After an extended period of questioning, the officers moved the focus more towards appellant's possible role in the killings. The officers pointed out that all other family members had alibis and that, on the day after the killings, appellant had a scratch on his face. The officers indicated that various informants had reported on appellant's change in behavior since the killings and had described appellant as having a violent temper. As the tone of the interview became more accusatory, Detective Scott asked appellant questions about some perceived inconsistencies in appellant's prior statements. Detective Scott in particular asked appellant why his response upon finding the bodies on Sunday morning had been so atypical. Detective Scott found it unusual that appellant stated that upon finding the bodies, he had not checked to see whether his parents were alive or dead, but had immediately called 9-1-1 and gone outside the house without further verifying his parents' condition.
Detective Scott testified that, during the course of the interview, after the investigating officers began indicating to appellant that they had evidence sufficient to support an indictment, appellant no longer affirmatively denied having killed his parents, but became more inquisitive about what evidence the officers might have. After a time, the officers suggested that appellant take a polygraph test. At this point, appellant asked to call his wife and spoke with her for about ten minutes. Thereafter, for the first time in the interview, appellant inquired about whether he was entitled to an attorney. The officers told him that he was not under arrest, and was therefore not entitled to have an appointed lawyer. When appellant seemed reluctant to carry the interview any further by either taking the polygraph test or further discussing his actions on the day of the crime, Rich and Scott announced that they were not going to waste their time any longer and got up to leave, stating that they would return to Columbus and seek an indictment. Appellant thereupon suggested that the officers not terminate the interview and agreed to take the polygraph test. While the facilities and personnel were being arranged for the test, appellant stated that he was having trouble with his asthma and that his medication was back at his office at Continental Airlines. Detective Scott drove appellant back to his office to get his medication, and returned. When they arrived back at the Sheriff's office, appellant's wife Celeste had arrived and was speaking with Sergeant Rich. The polygrapher was also present preparing to administer the polygraph test.
Because Celeste was extremely reluctant to have appellant take the test, appellant also began to hesitate. Detective Scott and Sergeant Rich again reiterated that if appellant no longer wished to cooperate, they would terminate the interview and head back to Columbus. Appellant then overrode his wife's reluctance and agreed to take the test.
After the test had been administered and analyzed by the polygrapher, the investigating officers showed appellant a typed summary of the test results which indicated that appellant had answered several questions untruthfully regarding his involvement in his parents' deaths. Celeste, who was present off and on during these discussions, after administration of the polygraph test, began to protest when she sensed that appellant was wavering. At that point, according to Detective Scott, appellant told Celeste to leave the room, and she began screaming and crying that he needed an attorney. Detective Scott's testimony was very specific that appellant did not state he wanted an attorney and ordered Celeste to leave the room. When Celeste would not do so, Detective Scott also asked her to leave and she did.
At that point, according to Rich and Scott, appellant stated that he did not want the officers to return to Columbus and admitted that he had killed his parents. He described going over to his parents' house, becoming involved in a confrontation with his father, and killing them with a baseball bat. Appellant asked to have his wife come into the room, and Detective Scott asked her to come in, telling her that her husband had just confessed. She became extremely agitated again and began screaming so Detective Scott told her to leave the room again. Detective Scott had attempted to tape-record appellant's statement, but the tape recorder was placed in the officer's pocket and did not record clearly.
Thereupon, Sergeant Rich entered the room with the tape recorder, and asked appellant to repeat his prior statement, which he did on tape. Prior to making his various statements, appellant explained to the investigators that he wanted to tell them his story "off the record."
Sergeant Rich's testimony largely corroborated that of Detective Scott. Sergeant Rich described the timeline of the initial part of the interview as lasting from 2:30 p.m. to 7:00 p.m. during which time appellant made no incriminating statements. Sergeant Rich testified that the polygraph test began about 8:00 p.m., and that appellant and Celeste were told about 9:00 p.m. that appellant had failed the polygraph test. Sergeant Rich also testified that although Celeste Caulley several times yelled at her husband that he needed an attorney, appellant's own inquiries in this direction were rather vague, and he indicated that he did not himself have an attorney that he wished to call. His inquiries were more along the lines of whether the investigators would furnish him an attorney at that time, and it had been indicated he would not be furnished an attorney as he was not under arrest.
On cross-examination, Sergeant Rich acknowledged that his summary of the interview, prepared immediately afterwards, seemed to acknowledge a specific request for an attorney by appellant, since the summary refers to a specific and detailed answer provided by Sergeant Rich to appellant's inquiry:
 * * * "I explained to Bob at that time that I could not call him a lawyer. I did not know any lawyers in Texas[.] * * * I again asked him if he knew or had a lawyer he wanted to call and he said no. I further explained to Bob that the rights waiver referred to an attorney being appointed by the court. I told him if and when you are charged with a specific crime, and you explain to the court that you cannot afford an attorney, the court will then appoint you a public defender. I further explained to him that it did not apply to him since he was not under arrest or anything, and he had not been charged with a specific crime." [Tr. at 263.]
Celeste Caulley's testimony at the suppression hearing in some respects does not contradict that of Detectives Scott and Sergeant Rich. In other respects, her testimony presents some significant differences on the question of whether appellant had requested an attorney. Celeste testified that, after the polygraph examination was taken and appellant had been told he failed, she told him that he needed an attorney and appellant then told the investigators to "[p]lease listen to my wife, you're not listening to my wife. We want an attorney." (Tr. at 319.) Celeste also testified that, when she left the room in which appellant ultimately made his tape-recorded statement, she was physically escorted from the room by Detective Scott. While she was outside the door, she screamed that appellant needed an attorney but was ignored by the officers.
Both the investigating officers and Celeste testified at length about subsequent events after appellant's arrest, including former Assistant Prosecutor Hogan's involvement in Celeste's arrest for obstruction of justice upon returning to Columbus. Since appellant made no further specific incriminating statements in response to these subsequent attempts at coercion by the investigating officers, this aspect of the testimony presented at the suppression hearing is not particularly useful in determining the admissibility of appellant's confession.
"Once an accused invokes his right to counsel, all further custodial interrogation must cease and may not be resumed in the absence of counsel unless the accused thereafter effects a valid waiver or himself renews communication with the police." State v. Knuckles (1992),65 Ohio St.3d 494, paragraph one of the syllabus. The question becomes, in the present case, whether the interview of appellant in Houston rises to the level of a "custodial interrogation," such that the procedural safeguards set forth in Miranda v. Arizona (1966), 384 U.S. 436, must be complied with as a means of securing appellant's constitutional privilege against self-incrimination.
Initially, we note that the fact that appellant was read his rights and executed a waiver is not necessarily indicative that he was in custody. The majority of courts have held that merely reading Miranda rights to a suspect fails to convert noncustodial questioning into a custodial situation. United States v. Charles (C.A.5, 1984), 738 F.2d 686; United States v. Lewis (C.A.6, 1977), 556 F.2d 446 (but, see, United States v. Bautista (C.A.10, 1998), 145 F.3d 1140, for the contrary position). Ohio adheres to this majority view. State v. Hatton (Apr. 19, 1999), Pickaway App. No. 97 CA 34, unreported. Beyond this, the determination of custody depends not on the subjective views of either the investigator or the person being questioned, but on the objective circumstances surrounding the interview. Stansbury v. California (1994), 511 U.S. 318. Nor is the fact that the interview takes place at a police station or comparable formal facility conclusive, since clearly persons under no form of restraint, nor even suspected of involvement of the crime(s) about which they are answering questions, can find themselves dealing with the police under these conditions. See, e.g., Oregon v. Mathiason (1977),429 U.S. 492; Stansbury, supra; State v. Petitjean (2000),140 Ohio App.3d 517; State v. Jenkins (Mar. 14, 2000), Harrison App. No. 98-502 CA, unreported; and State v. Metz (Apr. 21, 1998), Washington App. No. 96 CA 48, unreported.
In the present case, examining the objective circumstances of appellant's interview, we find that he was not in custody. There was substantially less conflict in the varying accounts of the circumstances of appellant's interview in Houston, as described by witnesses for the prosecution and defense at the suppression hearing, than there was on the question of whether appellant had requested counsel. There was no evidence presented to contradict the investigators' accounts that appellant had freely left his place of employment to come to the Harris County Sheriff's office to be interviewed. Nor was there any evidence to contradict the detectives' testimony that, on several occasions, they purported to wish to terminate the interview and return to Columbus, upon which appellant would urge them not to go and thus himself prolong the interview. Although appellant was, since he was transported by the officers to the station, for some time deprived of easy and practicable access to his own vehicle in order to depart, there is no indication that he in fact wished to do so. Moreover, after the arrival of his wife, lack of transportation no longer could play any part in appellant's voluntary continuation of his discussions with the investigators. Appellant's request to telephone his wife was granted, and when she arrived at the station he was given several opportunities to speak with her alone. It was, by all accounts including Celeste's, upon appellants urging that she left the room before he made his final tape-recorded statement. Although Celeste's testimony, if believed, would clearly establish that she herself was ushered from the room where appellant made his statements, and thereafter prevented from reentering the room by the officers, on these facts this alone does not appear to have imposed any actual loss of freedom or restraint upon appellant.
In summary, the objective circumstances of appellant's interview do not present the objective indicia of a custodial interrogation such that a right to counsel would attach.
Because we conclude that appellant was not in custody in the time that he made his incriminating statements during the Houston interview, we do not reach the substantially more difficult and uncertain question in this case of whether appellant in fact requested an attorney. Appellant's first assignment of error is accordingly overruled.
Appellant's sixth assignment of error addresses the question of whether his confession was, in fact, voluntary. In addition to the procedural safeguards set forth in Miranda and its progeny, an incriminating statement by an accused must be voluntary to be admissible. Voluntariness is determined from the totality of the circumstances. State v. Eley (1996), 77 Ohio St.3d 174, 178. Among the circumstances to be considered include the age, mentality, and prior criminal experience of the suspect; the length, intensity, and frequency of the questioning; and the presence or absence of physical deprivation or mistreatment. State v. Edwards (1976), 49 Ohio St.2d 31, vacated in part on other grounds (1978), 438 U.S. 911. In addition, the existence of threat or inducement rising to the level of excessively coercive conduct by police may render a confession involuntary. Colorado v. Connelly (1986), 479 U.S. 157. However, ploys to mislead a suspect or lull the suspect into a false sense of security will not render incriminating statements inadmissible as along as they do not rise to the level of undue compulsion or coercion. Mathiason, supra, at 495-496.
The ploy employed in the present case by the investigators is a common one. Appellant was led to believe that substantial independent evidence existed sufficient to support an indictment, and that the officers would return to Columbus and seek an aggravated murder indictment of appellant if he did not furnish "his side of the story" to show that the officer's assessment of his crime was inaccurate. This tactic is certainly not without precedent and has previously been found not to render a statement involuntary.
In State v. Knox (June 24, 1997), Franklin App. No. 96APA09-1265, unreported, this court reviewed a statement and found it voluntary under similar circumstances. In Knox, the police repeatedly requested to hear the appellant's side of the story and professed frustration and resignation when he did not, to the point of threatening to leave. We held that the subsequent confession was voluntarily given. Similarly, in the present case, appellant himself appears to have, in some respects, controlled the course of the interview. Both officers testified that they took breaks when appellant asked for breaks, and that appellant spoke to his wife several times when requested. On at least three occasions, according to the officers, they threatened to terminate the interview and return to Columbus; however, each time appellant called them back to the table. Appellant thereafter attempted to frame his incriminating statements as "off the record," a characterization not suggested by the officers initially although both appeared to have subsequently allowed appellant to think that the statements were "just between him and them." Appellant himself ordered his wife out of the interview room at the point where he began to make specific incriminating statements.
We are not concerned with any pressures upon appellant other than those induced by the police; indeed, from the record, it is difficult to deduce exactly what motivated appellant to confess. However, the Fifth Amendment is not concerned with psychological pressures to confess emanating from sources other than governmental coercion. Connelly, supra, at 170. Appellant's own motivation in pursuing the interview after the officers purportedly attempted to terminate it appears to have been as much to determine what additional evidence the officers had obtained against him as to proclaim his own innocence. The fact that the officers may, in fact, have had no additional evidence developed against appellant, under the circumstances, was not fatal to appellant's subsequent confession; as in Knox, we conclude that not all deception rises to the level of undue coercion, and on the present facts we find no reason to find appellant's confession involuntary. Appellant's sixth assignment of error is accordingly overruled.
Having addressed appellant's assignments of error concerning the trial court's denial of the motion to suppress appellant's confession, we now turn to appellant's assignments of error addressing alleged error occurring at trial. Appellant's second assignment of error asserts that the trial court erred in permitting the prosecution to present the testimony of Judge Hogan. Admission of evidence is within the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. Renfro v. Black (1990), 52 Ohio St.3d 27. An abuse of discretion connotes more than a mere error of judgment; it implies a decision is without a reasonable basis, and one that is clearly wrong. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Because appellant did not object at trial to Judge Hogan's testimony in toto, although certain specific aspects of the testimony were objected to, we review the general question of whether Judge Hogan should have been permitted to testify under the plain error standard. In order to constitute plain error, the error alleged must be obvious on the record, palpable, and fundamental such that it would have been apparent to the trial court without objection. State v. Tichon (1995),102 Ohio App.3d 758, 767. Plain error will not be found unless appellant establishes that the outcome of the trial clearly would have been different but for the trial court's alleged improper action. State v. Waddell (1996), 75 Ohio St.3d 163, 166. Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Phillips (1995),74 Ohio St.3d 72, 83.
Appellant relies on DR5-102 for the proposition that a prosecutor should not testify at trial. The state correctly points out on appeal that DR5-102 is not a rule of evidence, and moreover is intended to apply to testimony by a prosecutor in a case in which he is functioning as the prosecutor. Judge Hogan was no longer a prosecutor at the time of trial, and was clearly not functioning in that capacity in appellant's trial per se. We note, however, that Judge Hogan's rather ambiguous position in his interaction with appellant during appellant's first few days in jail after being arrested following his confession, including a telephone conversation with appellant, tend to blur Judge Hogan's position in the matter and could have pushed his role beyond mere police advisor to a form of de facto prosecutorial function at that early stage of the case. We nonetheless will not decide that specific issue, because the question can be resolved on other grounds.
There is a surprising absence of specific precedent on the question of whether a prosecutor or judge should be permitted to testify in a trial in which they are not serving in their official function, and in which they have no material evidence to offer on the central issues in the case. In the present case, the state admits on appeal that it is difficult to discern any rationale for presenting Judge Hogan's testimony at all. This testimony covered primarily advice given by Judge Hogan to the investigating officers about the interview with appellant, including the ultimate advice that, after appellant's confession, there was sufficient evidence to arrest him. Judge Hogan also detailed his advice to police which led to the arrest of appellant's wife on obstruction of justice charges. None of this testimony was particularly material to any issue raised at trial pertaining to appellant's guilt. It did allow the prosecution, however, to engage in a sustained course of questioning regarding appellant's "negotiations" with the investigating officers regarding production of a further, more detailed, statement by appellant while he was held in Columbus, in exchange for the release of his wife. The general tenor of this part of Judge Hogan's testimony can be taken as bolstering the proposition that appellant, in fact, had something to confess to in more detail, thus potentially reinforcing the perception of appellant's guilt.
Judge Hogan was effectively cross-examined by defense counsel, however, on the fact that Judge Hogan had advised the officers of whether there was sufficient probable cause to arrest appellant after his Houston confession. Judge Hogan was led to clearly state that such probable cause in no fashion would sustain the burden of proving at trial beyond a reasonable doubt that appellant was guilty. In general, then, Judge Hogan's testimony at trial must be viewed as not particularly productive for the prosecution, although certainly not helpful to the defense. Taken in its entirety, in the context of this case, the admission of such testimony by Judge Hogan does not rise to the level of plain error, because we cannot say that the outcome of the trial would have been different in its absence. However, we do acknowledge appellant's argument that testimony by a judge or prosecutor on peripheral matters in a case should be admitted with great caution. The impact of such testimony, imbued with disproportionate weight because of the aura of credibility and substance granted to the witnesses by their official positions, must be weighed relevant to its impact on the jury against the relevance of the testimony presented. Had Judge Hogan opined on the stand, as appellant incorrectly asserts on appeal, that the evidence in the case supported a finding of guilt, plain error could undoubtedly be shown on the substantial impact this would have had on the jury's perception of the facts and evidence. Given the generally inconclusive nature of Judge Hogan's testimony, however, while we conclude that such testimony should have been excluded on grounds of relevance and was thus erroneously admitted, no prejudice rising to the level of plain error can be shown. Appellant's second assignment of error is accordingly overruled.
Appellant's third assignment of error asserts that the trial court erred in admitting evidence regarding a supposed plot by appellant to have the prosecutor in his case killed. This alleged plot was mentioned by the prosecution in opening argument, and supported through the testimony of Todd Elkins, the inmate who asserted that he had been approached by appellant and offered $10,000 to kill the prosecutor. Elkins further elaborated that appellant had stated that his plan was to profit from the resulting delay in trial to obtain his release on bond, and thereafter flee. Detective Scott testified that, following up on this information from Elkins, he arranged a telephone conversation between appellant and Elkins after Elkins had been released from jail. Detective Scott listened to and recorded the conversation. The tape yielded "nothing to corroborate" the supposed plot, and Detective Scott subsequently destroyed the tape. (Tr. at 1837.) Detective Scott subsequently testified that the investigation into the supposed plot to murder the prosecutor was still ongoing.
The situation is comparable to that addressed by the Ohio Supreme Court in State v. Richey (1992), 64 Ohio St.3d 353, 357, in which defendant had made threats both against the prosecutor and potential witnesses in his murder trial:
 * * * This evidence included the following. Richey told Deputy Roy Sargent on November 19 that "Randy Bassinger [the prosecutor] was a dead man" and that "whoever testified against him had better hope he's six feet under." On August 17, Richey told Deputy Mike Ball to take a message to Randy Bassinger, "that when he got out he was going to cut his throat."
* * *
 Richey's threats reflect a consciousness of his guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses. See State v. Eaton (1969), 19 Ohio St.2d 145
* * * (flight from justice may indicate a consciousness of guilt); Cleveland v. McNea (1952), 158 Ohio St. 138, 142
* * * (suppression of adverse evidence constitutes a prejudicial circumstance of much weight); State v. Huffman (1912), 86 Ohio St. 229 * * *; Moore v. State (1853), 2 Ohio St. 500; 2 McCormick on Evidence (4 Ed. 1992), Sections 263, 265; 2 Wigmore on Evidence (Chadbourn Rev. 1979 and 1991 Supp.), Sections 273, 276 and 278.
While this court's first inclination might be to find the evidence of appellant's alleged plot to kill the prosecutor to be inadmissible as "other acts" evidence under Evid.R. 404(B), the Ohio Supreme Court's holding on this issue in Richey clearly imposes a contrary determination upon us. Although it could certainly be argued that evidence of intent to commit further crimes, such as a conspiracy to murder a prosecutor, could clearly be distinguished in their prejudicial effect for Evid.R. 404(B) purposes from an account of a defendant's attempt or intent to flee immediately after his crime or while awaiting incarceration, that distinction has not been adopted by the Ohio Supreme Court. We therefore find, pursuant to Richey, that the trial court did not err in permitting the testimony of inmate Elkins regarding appellant's alleged plot to murder the prosecutor in his case. Appellant's third assignment of error is accordingly overruled.
Appellant's fourth assignment of error asserts that the prosecution improperly suppressed evidence favorable to appellant, giving rise to a due process violation pursuant to Brady v. Maryland (1963), 373 U.S. 83.
The materials sought by the defense involved police investigatory files concerning an individual named Ricky Nelson, who reportedly had stated to several persons that he was involved in the murder of Charles and Lois Caulley. The prosecution apparently did turn over to the trial court a large box of documents stemming from the police investigation for the purpose of having the trial court review the materials therein and decide which documents should be given to defense counsel. This box of documents is part of the record upon appeal, and does in fact contain several references to possible involvement by Ricky Nelson in the crimes, and attempts by investigating officers to follow-up on this lead. Apparently, however, the trial court never released any of these documents to the defense.
In opening statements at trial, defense counsel named Ricky Nelson as the real killer, and asserted that Nelson had confessed to others his involvement in the crime. Later in the trial, the defense attempted to present testimony by individuals who would testify as to Nelson's prior incriminating statements. The trial court sustained a motion on hearsay grounds by the prosecution to deny this testimony because Nelson was, in fact, available to personally testify.
Initially, we note that in the present case there arguably has been no "suppression" of exculpatory information by the prosecution at all, since the materials were in fact turned over to the trial court. On comparable facts, the court in United States v. Ruggiero (C.A.2, 1973), 472 Fd.2 599, 604, held that "[t]here was no suppression of exculpatory evidence by the government. On the contrary, the government turned over the requested [materials] to the trial judge for in camera inspection and ruling. This conduct can hardly be classified as `suppression.'"
Even if we assume that the prosecution in the present case did suppress materials requested by the defense, we find that the evidence was not material. To establish a due process violation under Brady, a defendant must show: (1) that the prosecutor suppressed information; (2) that the information was favorable to the defense; and (3) that the information was material. Brady, supra, at 89.
"In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." State v. Johnston (1988), 39 Ohio St.3d 48, paragraph five of the syllabus. In the present case, appellant has not appealed or contested the trial court's determination that Ricky Nelson was in fact able to personally testify. Further development of hearsay statements made to police regarding Nelson's possible culpability in the murder of appellant's parents would not have materially advanced the defense, since such inquiry would also have been precluded on hearsay grounds. It is apparent from the pretrial proceedings and sidebar discussions at trial that the defense was aware of the statements allegedly made by Nelson, and in fact had been able to interview Nelson. Without passing on the question of whether the materials were in any respect potentially exculpatory, due to Nelson's availability as a witness, they would not have provided any exculpatory benefit and were therefore not material for purposes of finding a Brady violation. Appellant's fourth assignment of error is accordingly overruled.
Appellant's fifth assignment of error asserts that the trial court erred in allowing the prosecution to present detailed testimony of supposed "plea negotiations" between appellant, the investigating officers, and then-Assistant Prosecutor Hogan. Appellant asserts that testimony on these discussions was barred under Evid.R. 410(A)(5), providing in pertinent part that the following is inadmissible:
 [A]ny statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not result in a plea of guilty or that result in a plea of guilty later withdrawn.
Evid.R. 410(A)(5) is inapplicable to discussions between suspects and the police during interrogation or incarceration, since the police cannot plea bargain with a suspect. United States v. Karr (C.A.9, 1984), 742 Fd.2 493; see, also, State v. Mathews (1982), 8 Ohio App.3d 145, 146. However, the rule will apply "upon motion to suppress evidence if wrongfully obtained by promises made during the improper plea bargaining." In the present case, the statements admitted represented primarily appellant's attempts to inquire of the investigating officers what the consequences would be if he were indicted and convicted of aggravated murder, rather than on lesser charges. Even adopting appellant's possible subjective point of view, which would be inappropriate, these discussions could not be characterized as "plea negotiations." Although the question is somewhat blurred, again, by then-Assistant Prosecutor Hogan's intervention and telephone conversation with appellant while appellant was held immediately after his arrest, it is clear that under these circumstances Judge Hogan's position at that time could not have been interpreted as placing him in the position of furthering plea discussions for the state in the case, as required by Evid.R. 410(A)(5). We accordingly find that the trial court did not err in admitting testimony regarding appellant's discussion with the investigating officers of the consequences of an indictment, and appellant's fifth assignment of error is accordingly overruled.
Appellant's seventh assignment of error asserts that the trial court erred in allowing the jury to repeatedly listen to the audio tape recording of appellant's confession, because this placed undue emphasis on the confession in the context of the other evidence in the case. Again, admission of evidence and access to that evidence by the jury is at the discretion of the trial court. Appellant's confession was not only the keystone of the state's case, but once it had been admitted it became the center of the defense's strategy as well, since discrediting the confession was the major object of the defense. To this end, the defense presented both the testimony of appellant who attempted in depth to explain how he had been brought to confess to acts to which he now claimed he did not commit, and the testimony of an expert witness who explained how false confessions can be elicited through the techniques of the investigating officer in the interview with appellant.
Allowing the jury to listen repeatedly to the confession, therefore, did not unduly emphasize evidence favorable to the prosecution's case, since presumably those elements crucial to the defense's theory of false confession were also being addressed by the jury. We accordingly find no abuse of discretion on the part of the trial court in this respect, and appellant's seventh assignment of error is overruled.
In summary, we find that the trial court did not err in ruling that appellant's confession was admissible, and that appellant was not deprived of a fair trial by the court's evidentiary rulings. Appellant's seven assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
BOWMAN and BRYANT, JJ., concur.